UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )    CRIMINAL NO. 05-10154-MLW
        v.         )
                            )
JOHN J. DIAMONT, JR.,     )
            Defendant   )

OPPOSITION OF THE UNITED STATES
TO DEFENDANT'S MOTION FOR DISCOVERY

Now comes the United States, in opposition to defendant John J. Diamont, Jr.'s Motion for Discovery, and states:

1.  Yale Strogoff's Proffer

The defendant claims the United Stats has withheld discovery concerning promises, rewards or inducements given to Yale Strogoff. This is not true.  Local Rule 116.2(B)(1) requires the United States to provide the defendant with "[a] statement whether any promise, reward or inducement has been given to any witness whom the government anticipates calling in its case-in-chief, identifying ... each such promise, reward or inducement, and a copy of any promise, reward or inducement reduced to writing."  The United States has fully complied with this rule with regard to Yale Strogoff.

The United States has provided the defendant with a copy of the 9/26/01 proffer letter which sets forth the terms of Mr. Strogoff's proffer interviews and a copy of his May 7, 2004 plea agreement letter.  The United States has also advised the defendant, in writing, that when Mr. Strogoff testified in the grand jury on May 6,

2004, the United States agreed with his counsel to limit Mr. Strogoff's testimony to Massachusetts customers, because only the United States Attorney's Office for the District of Massachusetts was a party to the proposed plea agreement.  These are all the promises, rewards or inducements provided to Yale Strogoff.

The United States did not agree with Mr. Strogoff to exclude non-Massachusetts customers from his proffer interviews and, in fact, Mr. Strogoff did provide information in those interviews with regard to non-Massachusetts customers.  At the point when Mr. Diamont is entitled to get Jencks Act statements relating to Mr. Strogoff the defendant will get memoranda which show that Mr. Strogoff provided information relating to non-Masachusetts customers.

With regard to Steven Strogoff, Yale Strogoff's son, the September 26, 2001 proffer letter expressly provides that the information provided by Yale Strogoff cannot be used against his son, Steven.  This is the only promise which was made to Mr. Strogoff regarding his son and it has been disclosed to the defense.  In addition, although not required to do so, the United States has voluntarily provided the defense with the portions of the statements of witnesses which relate to Steven Strogoff's role in the operation of S. Strogoff & Co.  The defendant has been provided with more than he is entitled to, with regard to Yale Strogoff.  His discovery motion appears to be an attempt to obtain early Jencks Act disclosures with regard to Yale Strogoff and should be rejected.

2

2.  The C&J Trucking Investigation in NH

On June 5, 2003 Yale Strogoff was indicted in this district, and charged with having conspired with Richard and Robert Kradin to defraud the United States, by impairing and impeding the Internal Revenue Service in the administration of the tax laws relating to the Kradins.  A copy of that indictment is attached as Exhibit A.  On October 10, 2003 defendant Strogoff filed a Motion to Dismiss that case, arguing that he had received immunity in 1996 from the U.S. Attorney's Office in New Hampshire, in connection with the C&J Trucking investigation and "[i]f Strogoff mentioned the Kradins, or his relationship with them, he would be immunized."  Exhibit B, attached, p.1.  On October 31, 2003 the United States filed an opposition to Strogoff's Motion to Dismiss, which included the affidavits of AUSAs Huftalen of NH, Mullin of MA and IRS Special Agent Saunders.  A copy of that opposition, including the affidavits, is attached as Exhibit C.  In its opposition the Untied States argued that defendant Strogoff had (1) failed to show he had ever entered into an immunity agreement with the U.S. Attorney's Office for New Hampshire; (2) if there was such an agreement, he had failed to show he ever provided any information to anyone pursuant to such an agreement; and (3) all of the information used to return the pending indictment in MA had been obtained independent of the 1996 New Hampshire investigation.  Id.  Judge Zobel denied defendant Strogoff's Motion to Dismiss on February 23, 2004 by electronic

3

order, stating that the record "does not support defendant's assertion that he had been granted immunity."  Exhibit D attached, entry for 2/23/04.

In his Motion for Discovery defendant Diamont asks the Court to compel the government "to disclose the details of Mr. Strogoff's involvement with the issues involved in the C&J prosecution." Motion, p.3.  The United States has already done that.  We have provided defendant Diamont with a copy of our opposition to the Strogoff Motion to Dismiss including the Huftalen, Mullin and Saunders affidavits.  As set forth in the Huftalen affidavit, on October 11, 1996 a NH grand jury subpoena was issued to "Keeper of the Records Strogoff" calling for records relating to business done with C&J Trucking Co., Inc."  Exhibit C, Huftalen Affidavit, ¶9.  On November 8, 1996 AUSA Huftlen sent Strogoff's attorney a letter stating that neither Strogoff nor his company were a target or subject of the investigation.  Id. at ¶10.  Mr. Strogoff was never interviewed in the case.  Id. at ¶s 13-15.  Mr. Strogoff was not an anticipated trial witness in the case.  Id. at ¶16.  The Diamont prosecution team has no other information to provide relating to the C&J Trucking investigation.

3.  Relevant Conduct Relating to Strogoff's PSR

In 2001 and 2002 there were discussions between the United States and Yale Strogoff's counsel, William A. Brown, regarding Strogoff's possible plea and cooperation with the investigation.

Those discussions included proffer interviews with Yale Strogoff. The negotiations were unsuccessful, however, since Strogoff was not willing to plead guilty to any criminal offense.  The United States thereafter developed probable cause to indict Strogoff, using other witnesses, and did so on June 5, 2003, charging him with having conspired with Richard and Robert Kradin from "at least as early as the late 1980's and continuing until December, 1998" to defraud the United States by impairing the IRS in the administration of the tax laws relating to the Kradins.  Exhibit A, ¶5.  Strogoff initially fought that indictment, including filing a motion to dismiss it. Exhibit B.  The motion to dismiss was denied on February 23, 2004 and the case was set for trial beginning on May 17, 2004.  Exhibit D, entry for 3/16/04.  Shortly before the scheduled trial date, Strogoff's counsel initiated discussions regarding a plea agreement. On May 17, 2004, the day his trial was scheduled to begin, Strogoff pled guilty to the pending indictment, pursuant to a May 7, 2004 plea agreement.  Id., entry for 5/17/04.

    There was never any discussions between the United States and Strogoff's counsel regarding what tax loss information the United States would provide to the Probation Office regarding Strogoff's Pre-Sentence Report.  The United States provided the Probation Office the tax loss information for Kradin Metals, Inc. for the years 1996 to 1998, because this information had been calculated in connection with the prosecution of the Kradins.  We did not have records for

payment to the Kradins for years prior to 1996 and could not
calculate a loss for those years.

The United States has provided defendant Diamont with copies of
all the information regarding tax loss provided to Strogoff's
attorney at any time.  We have also provided the defendant with the
tax loss used in the prosecutions of the Kradins and Strogoff and the
calculations the IRS did as to Diamont and one other Strogoff
customer who is presently under investigation.

It is not clear to us what else the defendant is requesting.  He
says he wants "all calculations of all tax evasion in which Mr.
Strogoff was a knowing participant, or that arguably constituted
relevant conduct."  Motion, p.4.  He has all the calculations which
were done.  We were not able to do calculations for years prior to
1996 because we did not have records for those years.  We did not
pursue investigations relating to some of the customers Mr. Strogoff
provided information about, due to lack of investigative resources.
When the defendant gets the Jencks Act information relating to
Strogoff he will have the information we have relating to those
customers.  None of that information will be a calculation of
unreported income or tax loss.

The defendant asserts we are obligated to provide him with "all
Special Agent Reports and Revenue Agent Reports" relating to Strogoff
customers who have cheated on their taxes.  Motion, p.4.  This is not
true.  Such reports are highly confidential work product specifically
exempted from criminal discovery.  Fed. R. Crim. P. 16(a)(2).  We

6

have provided the relevant information from these reports, namely the
tax loss calculations, and the information provided to Strogoff's
attorney.  Nothing more is required.

The defendant boldly asserts that "Mr. Strogoff skimmed several
million dollars in cash from his business."  Motion, p.3.  He offers
no evidence or other information to substantiate this assertion,
however.  He asks for any information of which we are aware relating
to any taxes evaded by Mr. Strogoff, his family or his businesses.
We agree he is entitled to such information as to Yale Strogoff and
his businesses, but believe it is 21 day material which is not
producible now.  See L.R. 116.2(B)(2)(e) or (f).

4.  Information Relating to Stogoff Plea Negotiations

The Government has produced to the defendant, by letter, a full
description of what Strogoff's counsel said in connection with the
July 19, 2002 meeting.  There were not any particulars discussed with
regard to the defendant.

With regard to paragraph 11 of the Saunders affidavit, the
defendant assumes that Mr. Brown, Mr. Strogoff's attorney, identified
individuals who were engaged in criminal conduct at the August 24,
2000 meeting.  Mr. Brown did not.

The United States has produced to the defendant copies of its
June 5 and June 20, 2002 letters to William A. Brown, Mr. Strogoff's
attorney.

The United States did not give Mr. Strogoff any documents "to
outline his tax scheme and his accusations against others."  We did

provide to Mr. Strogoff's counsel copies of various documents which we said showed payments to various customers in the form of checks payable to fictitious payees or cash.  We have identified and made available to the defendant all such documents.

5.  CTRs, Forms 8300 and SARs

During the course of the investigation the government gathered some Currency Transaction Reports (CTRs) relating to Yale Strogoff for the years 1996 to 1998.  In response to the defendant's discovery requests the United States has produced to the defendant approximately 160 CTRs for the years 1996 to 1998.  Each CTR was filed by Broadway National Bank and relates to checks which Yale Strogoff cashed at the bank in connection with his business.  These CTRs represent all the CTRs we could find for the years 1996 to 1998 relating to Yale Strogoff, Steven Strogoff, S. Strogoff & Co., Inc., Strogoff Steel Trading Co., and/or Stephen Mandrachia, who is an employee of S. Strogoff & Co..  For the years 1996 to 1998 we looked for IRS Forms 8300 and Suspicious Activity Reports (SARs)for all five names listed above and could find no forms or SARs.

The defendant seeks an order requiring the prosecution to query the U.S. Department of the Treasury's FINCEN Data Center in Detroit to locate and produce any CTRs, Forms 8300 or SARs relating to any of the five names listed above for the years 1999 to 2005.  He provides no explanation as to how a cash transaction in 2005, involving Yale Strogoff, would be relevant or exculpatory to the pending indictment. The prosecution's obligations to search for exculpatory evidence is

limited to the law enforcement agencies formally participating in the criminal investigation which resulted in the case.  See, Local Rule 116.8 ("attorney for the government shall inform all federal, state and local law enforcement agencies formally participating in the criminal investigation that resulted in the case of the discovery obligations set forth in these Local Rules ....");  Ruiz v. United States, 221 F.Supp. 2d 66, 73-74 (D. Mass. 2002) (evidence within the possession of the government "includes exculpatory information in the possession of any agency that participated in the investigation of the crime charged. *** Brady does not, however, impose upon the government a duty to discover and produce exculpatory information in the possession of agencies not involved in the investigation.").  See also, Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed. 2d 490 (1995) ("individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.") Here the only law enforcement agency formally participating in the criminal investigation has been the Internal Revenue Service, Criminal Investigation and all the relevant CTRs, Forms 8300 and SARs in IRS, CI's possession have been produced to the defendant.

     The defendant also asserts, inaccurately, that the government claimed at Yale Strogoff's guilty plea that Mr. Strogoff "violated money laundering laws by structuring cash transactions so as to cause the Bank to fail to file [CTRs]."  Motion, p.5.  In fact, what the government said at Strogoff's guilty plea hearing was that on those

occasions when Strogoff owed the Kradins more than $10,000 more than one check was prepared (payable to a fictitious payee) and given to the Kradins, so that Richard and Robert Kradin could go to the Bank and cash a check for less than $10,000.  In his discovery motion, the defendant seeks all evidence the government has as to the number, date and details of transactions for which the Strogoffs evaded the creation of CTRs.  Motion, p.6.  The United States has already produced that information to the defendant.  We have provided the defendant with schedules we prepared of each check made payable to a fictitious payee which we attributed to the Kradins.  These schedules include the check number, date and the fictitious payee name used. We have also made the checks available to the defendant which show the date and time the check was cashed, the teller number and the teller transaction number.  Based on these documents the defendant can, if he wants to, prepare a schedule when two or more checks were cashed, in sequence, resulting in a disbursement of more than $10,000 in currency.  The United States has no obligation, however, to prepare such a schedule for the defense.

<u>Conclusion</u>

For the foregoing reasons, the Defendant's Motion For Discovery
should be denied.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                   By:
                              <u>/s/ Peter A. Mullin</u>
                              PETER A. MULLIN
                              Assistant U.S. Attorney

Dated: December 8, 2005


<u>CERTIFICATE OF SERVICE</u>

    I, Peter A. Mullin, Assistant U.S. Attorney, hereby certify that
a true copy of this document was served on counsel of record for the
defendant by electronic filing this 8th day of December, 2005.


                              <u>/s/ Peter A. Mullin</u>
                              PETER A. MULLIN
                              Assistant U.S. Attorney

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No. *03-10198-RWZ* |
| ) | |
| v. ) | Count 1, Conspiracy to Defraud |
| ) | the United States |
| YALE STROGOFF, ) | 18 U.S.C. §371 |
| Defendant ) | |

## INDICTMENT

The Grand Jury charges:

### Introduction

At all times material to this Indictment:

1.  YALE STROGOFF, the defendant herein, was a resident of Marblehead, MA, and the President and owner of S. Strogoff & Co., Inc. (hereinafter "S. Strogoff & Co.").

2.  S. Strogoff & Co. was a Massachusetts corporation, which engaged in the business of purchasing and re-selling scrap metal from Third Street in Chelsea, MA.

3.  Kradin Metal Co., Inc. was a Massachusetts corporation, which engaged in the business of purchasing and re-selling scrap metal.  Kradin Metal Co., Inc. was owned and operated by two brothers, Richard and Robert Kradin.  Kradin Metal Co., Inc. was a successor to a scrap metal business founded by Richard and Robert Kradin's grandfather and continued by their father, Bernard Kradin.

4.  Broadway National Bank was a small, federally chartered bank located in Chelsea, MA.  S. Strogoff & Co. maintained

several accounts at Broadway National Bank, including a checking
account.

### The Conspiracy

5.  Beginning at least as early as the late 1980's and
continuing until December, 1998, the exact dates being unknown to
the Grand Jury, in Chelsea and elsewhere in the District of
Massachusetts, the defendant herein,

### YALE STROGOFF

did knowingly, willfully and unlawfully combine, conspire, and
agree with other persons, known and unknown to the Grand Jury,
including but not limited to, Kradin Metal Co., Inc., Richard
Kradin and Robert Kradin, to defraud the United States by
impeding, impairing, obstructing and defeating the lawful
governmental functions of the Internal Revenue Service of the
United States Department of the Treasury in the ascertainment,
computation, assessment and collection of the revenue: to wit,
income taxes.

### Manner and Means

The manner and means by which the conspiracy was formed and
carried out included, among other things, the following:

6.  Kradin Metal Company, Inc. and its predecessor
businesses (hereinafter "Kradin Metals") sold scrap metal to S.
Strogoff & Co. on a regular basis.  Kradin Metal truck drivers
would drop off loads of scrap metal at S. Strogoff & Co.'s yard

and receive a ticket for each load, showing the date, type of metal and the weight of the load. S. Strogoff & Co. maintained a copy of these tickets.

7. Approximately every 1-2 weeks, S. Strogoff & Co. would pay Kradin Metals for the metal it had delivered. A weigh slip would be prepared showing the dates of each delivery received, the type of metal, the number of pounds delivered, the price per net ton and the amount due. A check was also prepared, on an account in the name of S. Strogoff & Company, Inc. at Broadway National Bank for the amount due. These checks were signed, as maker, by Yale Strogoff or his son, Steven Strogoff.

8. At the direction of Yale Strogoff, and with his knowledge, the checks for payments to Kradin Metals, for metal it had deliver to S. Strogoff & Co. were made payable to fictitious payees, meaning names which were made up for that purpose which did not correspond to the person selling the metal or even an actual person. The fictitious name was used on both the check and the corresponding weigh slip. During the period 1993 to 1998 it was the practice of the bookkeeper at S. Strogoff & Co. to use fictitious names with the initials "RK" for checks given to Richard Kradin and fictitious names with the initials "BK" for checks given to Robert (Bob) Kradin.

9. It was part of the conspiracy that Yale Strogoff, or others at S. Strogoff & Co. at Yale Strogoff's direction, would

3

call ahead to Broadway National Bank and request that the bank
have an envelope of cash ready in the amount of the checks
payable to fictitious payees to be given to Kradin Metals.

10.  Upon picking up checks from S. Strogoff & Co. which
were payable to fictitious payees, Richard and Robert Kradin
would take the checks to the Broadway National Bank and present
them to the Head Teller.  Even though neither Richard nor Robert
Kradin was a customer of Broadway National Bank, the Head Teller
gave Richard and Robert Kradin an envelope of United States
currency and coin, equal to the amount of the check, in exchange
for the check payable to the fictitious payee, without requesting
any identification from Richard or Robert Kradin, or other
evidence that they were the person to whom the check was made
payable.

11.  At Yale Strogoff's direction and with his knowledge, on
those occasions when S. Strogoff & Co. owed Kradin Metals more
than $10,000 for metal delivered to S. Strogoff & Co., two or
more checks and corresponding weigh slips would be prepared, each
in an amount less than $10,000 and using a separate fictitious
name, and given to Richard and/or Robert Kradin, so as to avoid
United States Treasury Department regulations which require banks
to file a Currency Transaction Report (CTR) with the Internal
Revenue Service whenever a bank cashes a check in an amount more
than $10,000.  On those occasions when Richard and Robert Kradin

4

cashed checks at Broadway National Bank, one immediately after the other, and each check was for less than $10,000, although the total amount of cash received by the two brothers exceeded $10,000, no CTR was prepared or filed by the bank relating to the transaction.

12.   By providing payments to Richard and Robert Kradin in this manner, Yale Strogoff knowingly aided the Kradins in failing to declare hundreds of thousands of dollars of income on the tax returns of Kradin Metals, and their own personal income tax returns, and failing to pay the tax due and owing thereon to the Internal Revenue Service.

<u>Overt Acts</u>

In furtherance of the conspiracy, and to effect the objects thereof, the defendant and the co-conspirators performed the following overt acts, among others, in the District of Massachusetts:

13.   On numerous occasions during the period from the late-1980's to the early 1990's Yale Strogoff paid Kradin Metals in cash for metal which had been delivered to S. Strogoff & Co.

14.   In or about the early 1990's, Yale Strogoff had a conversation with Richard Kradin about paying him for metal Kradin Metals sold to S. Strogoff & Co. by means of checks payable to fictitious payees which Kradin could cash at Broadway National Bank without showing any identification.

5

15. In or about the early 1990's, Yale Strogoff drove Richard Kradin to the Broadway National Bank, introduced him to bank personnel and told them he would be cashing checks drawn on S. Strogoff & Co.'s account.

16. In or about 1993, Yale Strogoff had a conversation with the bookkeeper at S. Strogoff & Co, Inc. in which he told her to make checks payable to fictitious payees when paying Kradin Metals and other customers.

17. During the period from the early 1990's until December, 1998, Yale Strogoff called Broadway National Bank on numerous occasions and requested the bank to have cash ready, in a specified amount, in preparation for giving Richard or Robert Kradin a check, made payable to a fictitious payee, which they would bring to the bank to cash.

18. On numerous occasions during the period from the early 1990s until December, 1998, Yale Strogoff met with Richard and/or Robert Kradin and gave them one or more checks payable to a fictitious payee in payment for metal delivered to S. Strogoff & Co.

19. Sometime in the early to mid 1990's Yale Strogoff had a conversation with Richard Kradin, in which Strogoff told Kradin that banks have to file Currency Transaction Reports (CTRs) if they cash checks in an amount greater than $10,000.

20. On numerous occasions, during the period from the early

1990s to December, 1998, Richard and Robert Kradin took checks received from S. Strogoff & Co., payable to fictitious payees, to Broadway National Bank, exchanged them for an envelope of cash in the same amount, and failed to account for those monies on the books and records of Kradin Metals and used the money personally, but did not report it on their personal income tax returns.

21.  On numerous dates during the years from 1996 to 1998 Kradin Metals, Richard Kradin and Robert Kradin filed false income tax returns with the Internal Revenue Service, which failed to declare the money received from S. Strogoff & Co. from scrap metal sales and failed to pay the tax due and owing thereon.

(All in violation of Title 18, United States Code, $371.)

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Peter A. Mullin
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; June 5, 2003. @ 11:31 AM

Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

8

**EXHIBIT B**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CRIMINAL NO:03-10198-RWZ.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| YALE STROGOFF ) | |

## MOTION TO DISMISS

Now comes defendant Yale Strogoff, and moves to dismiss the above referenced case. As grounds for this motion, defendant Yale Strogoff states he was granted immunity. Defendant Yale Strogoff, after numerous conversations and correspondences with the US Attorney's office in New Hampshire, received a grant of immunity in exchange for his cooperation with the investigation into the C&J Trucking Inc., case no. 97-cr-129. This current case in Massachusetts involves conspiracy with the Kradins. If Strogoff mentioned the Kradins, or his relationship with them, he would be immunized. Therefore, Mr. Strogoff requests that his Motion be Granted for the following reasons:

This is governed by *Kastigar v. United States*, 406 U.S. 441 (1972). The government must prove that it did not derive its current evidence from immunized statements. United States v. Catano, et. al. 65 F.3d 219 (1ˢᵗ Cir. 1995). In *Kastigar v. United States*, 406 U.S. 441 (1972), *rev. denied*, 408 U.S. 931 (1972), the Supreme Court established the principles to be applied when the government seeks an indictment and trial of a person previously granted use immunity with regard to his compelled sworn testimony. In *Kastigar*, the Court stated: "Once a defendant demonstrates that he has testified, under a ... grant of immunity, to matters related to the ... prosecution, the ... authorities have the burden of showing that their evidence is not tainted by establishing that they have an independent, legitimate source for the disputed evidence." *Kastigar v. United States*, 406 U.S 441. at 460, citing *Murphy v. Waterfront Commission*, 378 U.S. 52, 79, n. 18 (1964). The burden of proof "imposes on the prosecution the affirmative

duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S 441 at 460. However, the Court also stated that the Fifth Amendment "grants neither pardon nor amnesty" to those who testify under a grant of immunity. *Id.* at 461. Rather, the Fifth Amendment allows the government to prosecute so long as it uses evidence derived entirely from independent sources.

In order to determine the basis of the government's conspiracy claims against the Defendant, the Defendant respectfully requests that the government all statements, information and testimony that was obtained by the government with respect to the C&J Trucking Co., Inc. Investigation, case no 97-cr-129. Without such information, it cannot be determined if the government fulfilled its constitutional requirement and met its burden of obtaining information and evidence from a source independent of and untainted by the immunized testimony given by the Defendant. This is a major requirement provided for in the 5th Amendment of the Constitution and the precedent set in Kastigar, which has been has been adopted by this circuit. Without information to the contrary, this case must be dismissed because of defendant Strogoff's immunity.

Therefore, for the above-mentioned reasons, defendant Yale Strogoff respectfully requests that this Honorable Court grant this Motion to Dismiss.

Respectfully submitted,
Yale Strogoff
by his attorney,

William A. Brown
31 Milk Street, 5th Floor
Boston, MA 02109

## CERTIFICATE OF SERVICE

I, William A. Brown, hereby certify that I have served the foregoing motion on Assistant United States Attorney, Peter Mullin, by first class mail on this the 10th day of October 2003

William A. Brown

**EXHIBIT C**

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )    Criminal No. 03-10198-RWZ
            v.           )
                         )
YALE STROGOFF,           )
         Defendant       )

GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant Yale Strogoff has moved to dismiss the indictment, alleging that he entered into an immunity agreement in 1996 with the United States Attorney's Office for the District of New Hampshire, in exchange for his cooperation in an investigation that Office was conducting, and suggesting that some of the evidence used to return the current indictment may have been derived for information he provided pursuant to his New Hampshire agreement, thereby violating the rule of Kastigar v. United States, 406 U.S. 441 (1972). The United States opposes defendant's motion to dismiss because (1) defendant has failed to show he ever entered into an immunity agreement with the U.S. Attorney for New Hampshire; (2) if such an agreement was made, the defendant has failed to show he provided any information pursuant to that agreement; and (3) all of the evidence used to return the current indictment was independent of the 1996 New Hampshire investigation.

Factual Background

In July, 1996 the U.S. Attorney's Office for the District of New Hampshire commenced a grand jury investigation of alleged

violations of federal criminal law involving C&J Trucking Co., Inc. and its owners. <u>See</u> affidavit of Arnold H. Huftalen attached as Exhibit 1 (hereinafter "Huftalen Aff."), ¶5. This investigation focused on alleged violations by C&J Trucking of federal hours of service regulations for interstate truck drivers. The investigation followed a multiple fatality traffic collision on Interstate 93 in Londonderry, NH in which a C&J truck drove into the rear of an automobile, killing several occupants of the car. <u>Id</u>. at ¶s 1 and 4. On September 17, 1996 the former dispatcher of C&J Trucking provided the New Hampshire State Police with information relating to a company identified as Harold Strogoff Iron Metal Corporation, 285 Second Street, Everett, MA, with whom C&J Trucking had done business. <u>Id</u>. at ¶8. On October 11, 1996 a New Hampshire grand jury subpoena was issued to "Keeper of the Records of Strogoff," calling for the production of "any and all records relating to business done with C&J Trucking Co., Inc. ... for the period January 1, 1995 to the present. <u>Id</u>. at ¶9 and Exhibit A attached thereto.

William Brown represented Yale Strogoff in connection with the 1996 New Hampshire grand jury subpoena. On November 8, 1996 AUSA Huftalen sent Mr. Brown a letter stating that neither Mr. Strogoff nor his company was a target or subject in any ongoing investigation being conducted by the U.S. Attorney's Office for the District of New Hampshire. Huftalen Aff., ¶10 and Exhibit B

2

attached thereto.  The letter went on to state that the information sought by the subpoena would be used solely in the investigation and prosecution of individuals and entities in New Hampshire and would not be shared with any other investigators or prosecutors.  Id.

Later in November, 1996 AUSA Huftalen faxed a proposed Nonprosecution Agreement to Mr. Brown relating to Yale Strogoff. Huftalen Aff., ¶11.  This agreement, if executed, would have provided use immunity for any information provided pursuant to the agreement, plus a promise that no charges would be placed against Strogoff relating to the ongoing [C&J Trucking] investigation.  See Affidavit of Peter A. Mullin attached as Exhibit 2 (hereinafter "Mullin Aff.," ¶12 and Exhibit A attached. Brown faxed the draft agreement back to AUSA Huftalen with a request that a change be made.  Huftalen Aff., ¶11.  The change was made and AUSA Huftalen again faxed the proposed agreement to Brown.  Id.  There is no evidence the agreement was ever executed, however.  The files of the U.S. Attorney's Office for the District of New Hampshire do not contain a further reply from Mr. Brown, nor do they contain a copy of the Nonprosecution Agreement which bears defendant Strogoff's signature.  Id.  AUSA Huftalen has no memory of ever having a fully executed Nonprosecution Agreement with Yale Strogoff, nor does he recall any interview or debriefing of Mr. Strogoff during the course of

3

the C&J Trucking case.  Id. at ¶13.  None of the four
investigative agents who worked on the C&J Trucking case have any
memory of interviewing or debriefing Mr. Strogoff in connection
with the C&J Trucking case.  Id. at ¶14.  Had such an interview
been conducted, it would have been memorialized in a report of
interview in the NH State Police's investigative file, and a
review of that file shows no such report.  Id. at ¶15.

In support of his motion for discovery and inspection in
this case, defendant Strogoff submitted a three page
Nonprosecution Agreement, on the letterhead of the New Hampshire
U.S. Attorney's Office, which purports to contain Mr. Strogoff's
signature, but not the prosecutor's signature.  Mullin Aff., ¶12,
Exhibit A.  This document contains a handwritten addition to
paragraph 6 on page 2, which purports to expand the scope of the
agreement to include the United States Attorney's Office for the
District of Massachusetts. Id. at p.2.  The New Hampshire U.S.
Attorney's Office file for the C&J Trucking case does not contain
a copy of the proposed Nonprosecution Agreement with Yale
Strogoff which has this handwritten change, the change is not in
AUSA Huftalen's handwriting, and he did not initial the change.
Huftalen Aff., ¶11.

The Internal Revenue Service (IRS) initiated a criminal
investigation of Yale Strogoff in or about July, 2000.  See
affidavit of Timothy Saunders attached as Exhibit 3 (hereinafter

4

"Saunders Aff."), ¶2.  The investigation was an expansion of an existing tax and money laundering investigation of Edward Cronin, the owner of Cronin's Tavern, who operated a lucrative check cashing service out of a South Boston bar.  <u>Id</u>. In connection with the Cronin's investigation IRS agents observed that $235,000 in checks drawn on the account of S. Strogoff & Co., were cashed at Cronin's Tavern during 1998.  <u>Id</u>.

IRS Special Agent Timothy Saunders was assigned to the Strogoff investigation.  On August 8, 2000 SA Saunders served a grand jury subpoena on Yale Strogoff, for various records of S. Strogoff and Co., Inc.  <u>Id</u>. at ¶3 and Exhibit A.  Saunders was subsequently advised that William Brown would be representing Strogoff in connection with the investigation.  <u>Id</u>.  Brown produced records of Strogoff to Saunders over a two month period. <u>Id</u>.  Saunders had the IRS transcription center prepare schedules of the Strogoff corporate account checks for the years 1996-98. <u>Id</u>. Saunders received the completed schedules as of approximately February 2001.  <u>Id</u>.

In or about April, 2001 IRS agents not involved in the Strogoff investigation served a New Hampshire grand jury subpoena on S. Strogoff & Co., for information relating to alleged tax violations involving a New Hampshire company and individuals. <u>Id</u>. at ¶4.  The subpoena had been issued by AUSA Arnold Huftalen. <u>Id</u>.  Brown contacted Huftalen, told him he would be representing

5

Strogoff in connection with the subpoena, and informed him that
Strogoff was the subject or target of an ongoing Massachusetts
grand jury investigation being conducted by AUSA Buell and SA
Saunders.  Huftalen Aff., ¶s 17-18.  Thereafter, Brown had
several conversations with AUSA Huftalen in which he offered
Strogoff to Huftalen as a cooperating witness, in return for
favorable consideration in the Massachusetts investigation.  Id.

In or about June, 2001 SA Saunders did a manual review of
the checks produced by S. Strogoff & Co., in response to the
Massachusetts subpoena, and observed there were a large number of
checks made payable to names with the initials "RK" and "BK,"
which had been cashed at Broadway National Bank (BNB), Chelsea,
MA.  Saunders Aff., ¶5.  On July 11, 2001 Saunders went to BNB,
and interviewed two tellers who told him there were two brothers
who used to come into BNB and cash large checks drawn on the S.
Strogoff & Co. account.  Id.  These tellers did not know the
names of these brothers, but one of the tellers recalled that one
of the brothers had a young daughter who had died from cancer.
Id.

In August, 2001, while doing a systematic review of the
weigh slips which S. Strogoff & Co. had produced in response to
the Massachusetts subpoena, SA Saunders observed the name
"Kradin" on several weigh slips.  Saunders did Lexis internet
research relating to the name "Kradin" and found information that

6

Richard Kradin was the President of a local scrap metal company and that he had a young daughter who had died from cancer. Saunders Aff., ¶6.  On August 21, 2001, Saunders went back to BNB and showed the two tellers photographs of Richard and Robert Kradin.  Id.  The tellers identified the persons in the photographs as the individuals who had cashed S. Strogoff & Co. checks at BNB.  Id.

On September 26, 2001, Brown brought Strogoff to the U.S. Attorney's Office in Boston for a proffer interview.  Huftalen Aff., ¶19; Saunders Aff., ¶7.  Present for the government were AUSA Buell and SA Saunders, as well as AUSA Huftalen from New Hampshire and Jeff Landon, the IRS SA working on the New Hampshire investigation with Huftalen.  Id.  Brown and Strogoff signed a proffer letter agreement, which provided that nothing Strogoff said would be used against him or his son directly, but that the government may make derivative use against Strogoff of the information provided.  Huftalen Aff., Exhibit D.  The letter expressly provided that the U.S. Attorney was "not hereby agreeing that he will subsequently enter into a plea or immunity agreement with [Strogoff]."  Id.  AUSAs Buell and Huftalen signed this agreement for the U.S. Attorney.  Id.  During the September 26, 2001 proffer interview Strogoff told the government investigators he had done business with the Kradins and paid them for the metal they provided with checks made payable to

7

"fictitious names."  Saunders Aff., ¶7.

On November 8, 2001, a Massachusetts grand jury subpoena was issued to the Keeper of the Records, Kradin Metal Company for various records.  Saunders Aff., ¶8.  SA Saunders served the subpoena on an attorney representing the Company.  Id.  Kradin Metal Company documents were produced to SA Saunders in response to the subpoena.  Id.  On January 3, 2002 Robert George, an attorney representing Richard and Robert Kradin and their company, met with AUSA Buell and SA Saunders to discuss the investigation.  Id.  Buell and Saunders informed George they had evidence that the Kradins had failed to report substantial amounts of income received from Strogoff in the form of checks payable to fictitious payees.  On January 4, 2002 Buell and Saunders had a second proffer interview with Strogoff, in which he provided more detailed information about the Kradins and others.  Saunders Aff., ¶9.

In or about March, 2002, AUSA Buell transferred from the U.S. Attorney's Office to the Enron Task Force and the Strogoff investigation was assigned to AUSA Mullin.  Mullin Aff., ¶2; Saunders Aff., ¶10.  On May 28, 2002 AUSA Mullin spoke with Attorney Brown about the Strogoff investigation, telling him the United States was interested in Strogoff's cooperation against several of his customers, but it was not willing to immunize Strogoff in order to obtain his cooperation.  Mullin Aff., ¶3.

8

Brown said Strogoff has been cooperating and asked for
information regarding what the government claimed the tax loss to
be.  Id.  On June 5, 2002 Mullin sent Brown further information,
at his request, relating to the alleged tax loss and followed up,
on June 20, 2002, with copies of checks and other documents.  Id.
at ¶4.  On July 19, 2002 Strogoff and his attorneys met with
Mullin and Saunders to review the information relating to alleged
tax loss.  Strogoff's attorneys request additional documentation,
which is sent to them on July 24, 2002.  Id. at ¶5.

     On August 22, 2002 Richard and Robert Kradin appear at the
U.S. Attorney's Office with their attorney for proffer
interviews.  Mullin Aff., ¶6.  On September 10, 2002 the Kradins
enter into plea agreements with the U.S. Attorney's Office, which
provided they would plead guilty to filing false tax returns and
cooperate as to others who had committed offenses.  Id.  On
February 27 and March 6, 2003, respectively, Richard and Robert
Kradin testified before the grand jury about their dealings with
S. Strogoff and Co.  Id.  On December 3, 2002 a criminal
Information was filed against Richard and Robert Kradin charging
them with having filed false tax returns.  Id. at ¶7.  On
February 12, 2003 Richard and Robert Kradin pled guilty to having
filed false tax returns.  Id. at ¶6.

     On November 27, 2002 and May 6, 2003 additional subpoenas
were issued to S. Strogoff & Co., calling for the production of

9

additional records, relating to the years 1999, 2000 and 2001. Mullin Aff., ¶8.  S. Strogoff & Co. produced additional records in response to those subpoenas on January 9, and May 15, 2003. Id.

On June 5, 2003 the Grand Jury returned a one count indictment charging Yale Strogoff with having conspired with the Kradins to impair and impede the IRS.  Mullin Aff., ¶9.  Yale Strogoff was arraigned on that indictment on July 24, 2003, and pled not guilty.  Id. at ¶10.

On September 10, 2003 Mullin and Brown had a telephone conversation in which Brown advised Mullin that defendant Strogoff claimed he was previously immunized in New Hampshire, but Brown provided no details relating to the alleged immunity. Mullin Aff., ¶10.  On September 12, 2003, at the Initial Status Conference, defendant Strogoff filed a Motion for Discovery and Inspection, which requested, among other things, production of materials from New Hampshire relating to the C&J Trucking case. Mullin Aff., ¶11.  This motion was the first notice the U.S. Attorney's Office had of the C&J Trucking Co. matter.  On September 25, 2003 defendant Strogoff filed a Memorandum in support of his Motion for Discovery and Inspection which included, as Exhibit A, a copy of the November 22, 1996 alleged Nonprosecution Agreement from the U.S. Attorney's Office in New Hampshire.

10

ARGUMENT

I.    Defendant Strogoff Has Failed to Demonstrate That He Was
      Granted Use Immunity in Connection with the 1996 New
      Hampshire Investigation

     In <u>Kastigar v. United States</u>, 406 U.S. 441 (1972), in
upholding the federal use immunity statute, 18 U.S.C. §6002, the
Supreme Court said:

          One raising a claim under this statute need only show
          that he testified under a grant of immunity in order to
          shift to the government the heavy burden of proving
          that all of the evidence it proposes to use was derived
          from legitimate independent sources.

406 U.S. at 461.  In placing the initial burden on the person
claiming the use immunity, the <u>Kastigar</u> court relied on, and
quoted, the following language from <u>Murphy v. Waterfront</u>
<u>Commission of New York Harbor</u>, 378 U.S. 52 (1964), which held
state grants of use immunity binding on the federal government:

          Once a defendant demonstrates that he has testified
          under a state grant of immunity, to matters related to
          the federal prosecution, the federal authorities have
          the burden of showing that their evidence is not
          tainted by establishing that they had an independent,
          legitimate source for the disputed evidence.

406 U.S. at 460, quoting from 378 U.S. at 79 n.18.  <u>See</u>, <u>United</u>
<u>States v. Smith</u>, 580 F. Supp. 1418, 1420 (D. NJ 1984) (finding
that defendant had made the initial demonstration required by
<u>Murphy</u> and therefore government had burden to show evidence
derived independently of immunity grant.)  Thus, it is clear that
the initial burden is on the defendant to show he provided

11

information pursuant to a use immunity agreement.

Here the defendant has failed to meet his burden of demonstrating an immunity agreement.  Defendant Strogoff submits no affidavit in support of his motion which asserts he entered into such an agreement.  The document he submitted in support of his Motion for Discovery and Inspection is unsigned by the prosecutor.  This document is also internally inconsistent, since the first page bears the dated November 22, 1996, while the last page, which purports to bear defendant's signature bears the date November 20, 1996.  Mullin Aff., ¶12.  The prosecutor who handled the 1996 New Hampshire investigation has no recollection of ever receiving a signed Nonprosecution Agreement from the defendant and the files of the New Hampshire U.S. Attorney's Office do not contain such a document.  Huftalen Aff., ¶s 11 and 13.

II.    Defendant Strogoff Has Failed to Demonstrate He Ever
       Provided Any Information Pursuant to His Alleged Immunity
       Agreement.

Even if there was an immunity agreement between Strogoff and the U.S. Attorney's Office for the District of New Hampshire, the defendant has failed to prove he ever provided any information pursuant to that agreement.  The 1996 New Hampshire grand jury subpoena was directed to the Keeper of the Records Strogoff for corporate records, to which no Fifth Amendment privilege against self-incrimination attaches.  Bellis v. United States, 417 U.S.

12

85, 88 (1974); In Re Grand Jury Subpoena, 973 F.2d 45, 47 (1st Cir. 1992); In Re Grand Jury Proceedings (The John Doe Company, Inc.), 838 F.2d 624, 625 (1st Cir. 1988). The records called for by that subpoena were unrelated to Richard or Robert Kradin or their dealings with S. Strogoff & Co.

In his Memorandum in Support of Defendant's Motion For Discovery and Inspection, p.2., the defendant asserted that he "gave interviews to the United States Attorney's Office in New Hampshire, as a result of this nonprosecution agreement." Again he submits no affidavit to support this assertion, nor does he provide any information about when, where or with whom these alleged interviews took place, nor the subject matter of the interviews. In his motion to dismiss the defendant does not even allege that he was interviewed pursuant to his claimed Nonprosecution Agreement, or that he ever provided any information relating to the Kradins. Rather, he asserts "[i]f Strogoff mentioned the Kradins, or his relationship with them, he would be immunized." This assertion fails to meet defendant's burden of showing he provided information relevant to the pending case, pursuant to an immunity agreement.

The Assistant U.S. Attorney who handled the 1996 New Hampshire investigation has submitted an affidavit stating he has no recollection of any such interview and he has contacted the four investigators who worked on the case and they also have no

13

recollection of any such interview. Huftalen Aff., ¶s 14 and 21.
AUSA Huftalen's affidavit also indicates that if there had been
such an interview there would have been a written report of the
interview and a search of the files has turned up no such report
of interview. Id. at ¶15. Thus the evidence indicates the
defendant never provided any information in the 1996 New
Hampshire investigation which could have tainted the later
Massachusetts investigation.

III. The United States Has Demonstrated A Legitimate Independent
     Source For The Evidence Presented To the Grand Jury

     In Kastigar v. United States, 406 U.S. at 460, the Supreme
Court said that once a defendant has demonstrated he has provided
information, pursuant to an immunity grant, relating to a pending
case, the prosecution has

          the affirmative duty to prove that the evidence it
          proposes to use is derived from a legitimate source
          wholly independent of the compelled [immunized]
          testimony.

See also, United States v. Serrano, 870 F.2d 1, 14-17 (1st Cir.
1989); United States v. Underwood, 880 F.2d 612, 616 (1st Cir.
1989). The United States has met that burden in this case.

     As the affidavit of Special Agent Saunders makes clear, the
United States identified the Kradins based on a review of the
checks and weigh slips produced by S. Strogoff & Co. in response
to subpoenas, and interviews with the tellers at Broadway

14

National Bank.  Saunders Aff., ¶s 5-6.  These were corporate
records to which no Fifth Amendment privilege attached.  <u>Bellis
v. United States</u>, <u>supra</u>; <u>In re Grand Jury Subpoena</u>, <u>supra</u>; <u>In Re
Grand Jury Proceedings</u> (<u>The John Doe Company, Inc.</u>), <u>supra</u>.  The
United States then obtained the cooperation of the Kradins,
pursuant to plea agreements, and put them in the grand jury to
testify to their dealings with Yale Strogoff.  Mullin Aff., ¶s 6,
7 and 9. The United States also put various present and former
employees of S. Strogoff and Co. and Broadway National Bank in
the grand jury.  <u>Id</u>., ¶9.  There is absolutely no evidence any of
these persons had any connection to the C&J Trucking
investigation.

     The attached affidavits of AUSAs Huftalen and Mullin and
Special Agent Saunders also affirmatively demonstrate that no
information obtained in the C&J Trucking case was used to return
the indictment in this case.  AUSA Huftalen states he has no
memory that he "ever met, interviewed or debriefed Mr. Strogoff
during the course of the C&J case."  Huftalen Aff., ¶21.  He goes
on to state "I have never conveyed any information to the U.S.
Attorney's Office for the District of Massachusetts concerning
Mr. Strogoff and the Kradins."  <u>Id</u>.  AUSA Mullin states he never
heard of the C&J Trucking case until defendant Strogoff raised it
in his motion for discovery and inspection filed September 12,
2003 at the Initial Status Conference in this case.  Mullin Aff.,

¶14.  He goes on to state that he has never met or spoken with the investigators on the C&J Trucking case and that AUSA Huftalen has never provided him with any information about Mr. Strogoff and his relationship with the Kradins.  Id.  Similarly, SA Saunders has said he was unaware of the C&J Trucking matter, and Mr. Strogoff's connection to it, until AUSA Mullin informed him about the matter following the Initial Status Conference in this case.  Saunders Aff., ¶13.  He goes on to state he has never met or spoken with the investigators involved in the C&J Trucking case and that AUSA Huftalen and IRS agents working with him have never provided him with any information about Mr. Strogoff and his relationship with the Kradins.  Id.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss the indictment should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

PETER A. MULLIN
Assistant U.S. Attorney

Dated: October 31, 2003

## CERTIFICATE OF SERVICE

I, Peter A. Mullin, Assistant U.S. Attorney, hereby certify that I have caused a copy of the foregoing document to be served on counsel of record for each other party by mail this 31st day of October, 2003.

PETER A. MULLIN
Assistant U.S. Attorney

16

Affidavit

I am an Assistant U.S. Attorney in the District of New Hampshire where I have been so employed since March of 1991. I have reviewed copies of two pleadings filed by the defendant in the case of United States of America v. Yale Strogoff, Criminal No: 03-10198-RWZ; defendant's Motion For Discovery and Inspection with Memorandum in Support, and defendant's Motion to Dismiss. I am the Assistant U.S. Attorney who handled the New Hampshire case of United States v. C & J Trucking, et. al, Cr. No. 97-129-01, 02, 03-B (hereafter "the C & J case") referenced in the defendant's Motions. I have retrieved and reviewed my closed case file from that case. In the ordinary course, closed cases are purged when they are sent to archives. However, a number of items are usually retained, including all correspondence, pleadings, grand jury subpoenas and grand jury transcripts. Based upon my review of that file, my memory of that case and my discussions with the investigating agents, I swear that I have conducted a diligent review and search of my file and that the following is true and correct to the best of my knowledge:

1. The C & J case arose out of a multiple fatality traffic collision which occurred August 2, 1995 on Interstate 93 in Londonderry, New Hampshire. That crash involved a truck, owned an operated by, C & J Trucking, which, while approaching a construction zone, drove into the rear of an automobile. The crash resulted in a fire and the death of several occupants of that automobile.

2. The criminal investigation relating to the fatalities was conducted by the New Hampshire State Police, Sergeant Charles Forsaith. Assisting the State Police were Sergeant Wayne Peasley of the New Hampshire Division of Highway Enforcement and Special Agents Jeffrey Cimahosky and Steven Piwowarski of the then United States Department of Transportation, Office of Motor Carrier, now the U. S. Department of Transportation, Federal Motor Carrier Safety Administration. The latter two agencies deal with highway/trucking safety regulations and compliance.

3. The State of New Hampshire, Rockingham County Attorneys Office, conducted a lengthy and extensive Grand Jury investigation which resulted in an Indictment charging the C & J truck driver with negligent homicide. That investigation included interviews and State Grand Jury testimony of many witnesses. It resulted in the accumulation of more than fifty (50) bankers boxes of records, including but not limited to time cards, driver daily sheets (daily records of driver activities), dispatch logs, truck weight slips, payroll records and bank records. Those records were obtained by requests for production, State Grand Jury subpoenas and a State search warrant. Many of the witnesses were then current and former employees of C & J Trucking.

4. C & J Trucking had a known history of non-compliance with federal hours of service regulations, which limit the total number of hours a truck driver may be on duty. That State investigation developed evidence which tended to prove that C & J Trucking had embarked upon a course of conduct which continued to violate the regulations in a way which made the

violations more difficult to detect. This included the submission of fraudulent and altered time cards, which understated the hours on duty. Generally speaking, drivers were paid through the C & J payroll system only for hours which would not appear to be in violation of regulations and were paid with "contract labor checks" for the hours they worked in violation of the hours of service regulations. Consequently, a mere review of the payroll records, which was standard procedure in D.O.T. compliance reviews, would not disclose the violation conduct.

5. On July 18, 1996 a federal Grand Jury investigation was opened in the United States Attorney's Office for the District of New Hampshire, looking into possible violations of Title 18 USC 1001 and various Title 49 (trucking regulation) violations by C & J Trucking and its owners, Charles Georgoulakos, Jr. and James Georgolakos. Ultimately, the company and its two owners plead guilty to Title 49 violations and each received a 12 month split sentence; six months in prison and six months in home confinement. The C & J case was significant in that it was the first case in the United States in which trucking company executives went to prison for hours of service regulation violations. The defendants in that case were represented by Attorneys Martin Weinberg, Steven Gordon and Stephen Delinsky.

6. Due to their familiarity with the facts, the investigators referenced above conducted the investigation in the federal case. Sergeant Forsaith was the only investigator with criminal investigation experience and he continued to be the lead investigator. To the exclusion of the others he maintained the criminal investigative file, conducted interviews and prepared reports of those interviews for inclusion in his continuing report.

7. For a period of time both the State case and the federal investigation ran simultaneously. However, when the truck driver was acquitted after a jury trial all state proceedings ceased and the federal case proceeded. All evidence which had been gathered in the state proceeding was transferred to the federal investigation.

8. During the course of the federal investigation, the former dispatcher of C & J Trucking, William Halberstadt, was interviewed by Sergeant Forsaith on three occasions, August 29, 1996, September 17, 1996 and September 18, 1996. Sergeant Forsaith memorialized each interview with a written report, as was his custom and practice, which was filed in his continuing investigation report. During the second interview on September 17, 1996, Halberstadt provided information concerning two companies with which C & J Trucking had engaged in business and which prior to that time were unknown to the investigation. One of these companies was described by Halberstadt as, Harold Strogoff Iron Metal Corporation, 285 Second Street, Everett, Massachusetts.

9. Virtually identical federal Grand Jury subpoenas were issued to "Keeper of Records Strogoff" and the other company. Those subpoenas were dated October 11, 1996 and served on October 15, 1996. The return date was October 30, 1996. They called for the production of "[a]ny and all records relating in any way to business done with C & J Trucking Co., Inc. and/or ... for the time period of January 1, 1995 to the present." A copy of the subpoena is attached

Page 2 of 5

hereto as Exhibit A.

10.  My correspondence file from the C & J Trucking case contains a one page letter to Attorney William Brown, dated November 8, 1996 in which I reference "telephone conversations" and advise Attorney Brown that neither Mr. Strogoff nor his company are targets or subject of my investigation or of any other of which I was aware.  The letter requests that the subpoenaed documents be forwarded to me via Federal Express or Registered Mail and that Mr. Strogoff need not at that time appear before the Grand Jury.  A copy of the letter is attached as Exhibit B.

11.  I have reviewed the document attached to the defendant's Memorandum in support of his Motion for Discovery and Inspection, which is marked as Exhibit A and entitled "Nonprosecution Agreement."  All correspondence, outgoing and incoming, including fax cover sheets and fax confirmation sheets, would have been retained in the closed file.  I have reviewed the correspondence file and can say that at the request of Attorney Brown I did draft and did fax that draft document to him in November of 1996.  The file does contain fax cover sheets and confirmation sheets showing that the draft document was faxed to Attorney Brown and that Attorney Brown faxed it back to me with a request that a change be made.  That change was made and the document was again faxed to Attorney Brown.  However, the file does not contain a further reply from Attorney Brown, nor does it contain a copy of the document which purports to bear the defendant's signature.  Nor does the file contain a copy with the handwritten notations which are included on the copy submitted by the defendant.  Those handwritten notations on the copy submitted by the defendant ( "or the District of Massachusetts") are not in my handwriting, were not written by me and do not appear anywhere on any document in my file.  Nor are either of the initials which appear on the copy submitted by the defendant my initials.

13.  I have no memory of ever having a fully executed Nonprosecution Agreement with Yale Strogoff and have no memory of any interview or debriefing of Mr. Strogoff during the course of the C & J case.

14.  Within the last few weeks I have spoken with all four of the investigating agents who have each advised me that they have no memory of any interview or debriefing of Mr. Strogoff in the C & J case.

15.  Forsaith, who is no longer with the State Police, has advised me, consistent with my memory, that he was the investigator who would have interviewed or debriefed Mr. Strogoff if such had taken place during the C & J case and that if such an interview or debriefing had taken place he would have memorialized such with a report of interview for inclusion in his investigative file.  He has no memory of any such interview of debriefing of Mr. Strogoff.  I have reviewed the original New Hampshire State Police investigative file from the C & J case and it does not contain a report of interview concerning Mr. Strogoff.

16.  My file shows that on May 4, 1998, and pursuant to my obligations under Bagley and

Giglio, in the C & J case, I produced to defense counsel copies of Kastigar proffer letters which had been signed by two government witnesses, William Halberstadt and Christine Davis. My file does not reflect that I ever disclosed to defense counsel in the C & J case anything concerning Mr. Strogoff as a potential government witness.

17. I am currently handling an investigation into allegations of tax violations by a company and individuals in New Hampshire. During the course of that investigation I caused a Grand Jury subpoena to be served upon "S. Strogoff & Co., Inc., Chelsea, MA" in April of 2001 seeking documents. After the subpoena was served, I received a telephone call from Attorney Brown. I then wrote a letter to Attorney Brown dated April 17, 2001 in which I stated, "I was unaware that Strogoff was your client, or that your client was the subject or target of an ongoing investigation at the time I had a Grand Jury subpoena served upon it. I have advised the agents working on my case of your representation." The letter goes on to allow for whatever additional time was required by his client to produce the records and advising Attorney Brown that his client need dot appear before the Grand Jury. A copy of that letter is attached as Exhibit C.

18. Thereafter, I had numerous conversations with Attorney Brown and AUSA Sam Buell who was at that time handling the Strogoff investigation in the U.S. Attorney's Office for the District of Massachusetts. Generally speaking, Attorney Brown wanted to offer his client as a witness in my case in exchange for favorable consideration with respect to AUSA Buell's investigation.

19. A proffer session was arranged between AUSA Sam Buell and Attorney Brown for Mr. Strogoff. I was invited to attend, and did attend, that proffer session which took place in the U.S. Attorney's Office in Boston on September 26, 2001. The letter pursuant to which that proffer took place was drafted by AUSA Buell and was on his office's letterhead. I signed a handwritten signature line which was added to the letter at the time of the proffer. A copy of that Letter is attached as Exhibit D.

20. I have not conveyed any information concerning Mr. Strogoff to the U.S. Attorney's Office for the District of Massachusetts, other than information I have learned from Attorney Brown during the course of the current investigations. Any of that information necessarily has been learned after April 2001, after I learned of Attorney Brown's representation of Mr. Strogoff in the Massachusetts investigation. See Exhibit C.

21. In his Motion to Dismiss, at page 1, paragraph 1, Attorney Brown, when discussing the C & J case, states "[t]he current case in Massachusetts involves conspiracy with the Kradins. If Strogoff mentioned the Kradins, or his relationship with them, he would be immunized." I have no records to show, nor do I have any memory, that I ever met, interviewed or debriefed Mr. Strogoff during the course of the C & J case. I have never conveyed any information to the U.S. Attorney's Office for the District of Massachusetts concerning Mr. Strogoff and the Kradins.

Page 4 of 5

October 23, 2003

With the understanding that this Affidavit will be provided to the United States District Court for the District of Massachusetts in a judicial proceeding now pending, under the pains and penalties of Title 18, United States Code, Sections 1001 and 1503(a), I swear that the information contained herein is true and correct to the best of my knowledge.

Arnold H. Huftalen
Assistant U.S. Attorney
District of New Hampshire

Sworn before me This
date 10/23/03

Clyde R.W. Garrigan
Justice of the Peace
My Comm. expires 11/13/07

AO 110 (Rev. 12/89) Subpoena to Tes..., Before Grand Jury

# United States District Court

DISTRICT OF **NEW HAMPSHIRE**

TO: *KEEPER OF RECORDS OF*
Strogoff

## SUBPOENA TO TESTIFY
## BEFORE GRAND JURY #1

SUBPOENA FOR:

☐ PERSON      ☒ DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| Fourth Floor<br>James C. Cleveland Federal Building<br>55 Pleasant Street<br>Concord, NH  03301 | Grand Jury Room |
| | DATE AND TIME<br>October 30, 1996 9:30 a. |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

Any and all records relating in any way to business done with
C & J Trucking Co., Inc. and/or Spartan Consolidated, Inc. for
the time period of January 1, 1995 to the present.

Compliance can be made be delivering the records to the grand jury
or to Sgt. Charles Forsaith, New Hampshire State Police (603) 672-3333
prior to October 30, 1996.

GOVERNMENT
EXHIBIT
A - 2 PAGES
HUFTALEN

☐ *Please see additional information on reverse*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| | October 10, 1996 |
| (BY) DEPUTY CLERK | |

This subpoena is issued on application
of the United States of America

**United States Attorney**

NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY

Arnold H. Huftalen, AUSA
U.S. Attorney's Office
55 Pleasant St., Room 312
Concord, NH  03301
(603) 225-1552      Inv. 96R0224

*If not applicable enter "none"

AO 110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

## RETURN OF SERVICE [1]

| | DATE | PLACE |
|---|---|---|
| **RECEIVED BY SERVER** | 10/1/96 | 55 Pleasant St. Concord NH 03301 |
| **SERVED** | 10/15/96 | 315 THIRD ST. CHELSEA MA 02150 |

**SERVED ON (PRINT NAME)**

YALE STROGOFF

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| STEVEN M. PIWOWARSKI | SPECIAL AGENT USDOT |

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER [2]

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ___10/15/96___
                    *Date*

_____
*Signature of Server*

279 Pleasant St Concord NH 03301
*Address of Server*

**ADDITIONAL INFORMATION**

) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.
) "Fees and mileage need not be tendered to the witness upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)".



U.S. Departm⸝ ⸍f Justice

$\dfrac{F}{C}$

c ⨍J

*United States Attorney*
*District of New Hampshire*

*Federal Building*                                       603/225-1552
*55 Pleasant Street, Room 312*
*Concord, New Hampshire 03301*

November 8, 1996

William Brown, Esq.
50 Milk St.
19th Floor
Boston, MA 02109

Re: <u>Strogoff</u>                          <u>VIA FAX ONLY  (617) 426-0490</u>

Dear Attorney Brown:

     In follow up to our telephone conversations, please be advised that neither Mr. Strogoff nor his company is a target or subject in any ongoing investigation being conducted by the U.S. Attorney's Office for the District of New Hampshire. Nor am I aware that he or it is a target or subject of any investigation by any other law enforcement agency or prosecutive office. The information sought by the Grand Jury in the District of New Hampshire will be used solely in the investigation and possible prosecution of individuals and entities in New Hampshire. Any information provided by Mr. Strogoff or his company will be maintained in this office under the restrictive limitations imposed by Fed. R. Crim. P. 6(e), and will not be shared with any investigators or prosecutors other than those involved in my investigation.

     I hope this letter provides you and your client with sufficient peace of mind. Should you need to discuss the matter further, I am available at (603) 225-1552 ext. 218. Otherwise, I will expect to receive the subpoenaed documents via Federal Express or Registered Mail. Mr. Strogoff need not, at this time, appear before the Grand Jury.

     Thank you for your assistance.

Very truly yours,

PAUL M. GAGNON
United States Attorney

By:

Arnold H. Huftalen
Assistant U.S. Attorney

GOVERNMENT
EXHIBIT
B — 1 PAGE
HUFTALEN



**U.S. Department of Justice**

*United States Attorney*
*District of New Hampshire*

---

*Federal Building*                                                    *603/225-1552*
*55 Pleasant Street, Room 312*
*Concord, New Hampshire 03301*

April 17, 2001

William Brown. Esq.
100 State St.
9th Floor
Boston, MA 02109

    Re: <u>Strogoff</u>

Dear Attorney Brown:

    Please accept this letter in follow up to our recent telephone conversations.  It was a pleasure to speak with you again.

    I was unaware that Strogoff was your client, or that your client was the subject or target of an ongoing investigation at the time I had a Grand Jury subpoena served upon it.  I have advised the agents working on my case of your representation.

    I also understand that your client needs additional time to respond to the document subpoena.  Please let me know when you believe the documents will be available.  Take whatever time you reasonable need.  Obviously, we will not require your client to appear before the Grand Jury at this time.  You may forward the record directly to my attention.

    Very truly yours,

    PAUL M. GAGNON
    United States Attorney

    By:
    Arnold H. Huftalen
    Assistant U.S. Attorney

bcc: Sam Buell



GOVERNMENT
EXHIBIT
C - 1 PAGE
HUFTALEN



"STROGAF F
PROFFER
AGREEMENT"

ROBERTS

**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*              *John Joseph Moakley United States Courthouse*
                                              *1 Courthouse Way*
                                              *Suite 9200*
                                              *Boston, Massachusetts 02210*

September 26, 2001

William A. Brown, Esq.
112 Water St.
Boston, MA 02109

     Re:  Yale Strogoff

Dear Mr. Brown:

     This letter confirms that the U.S. Attorney for the District
of Massachusetts will consider an accurate and complete proffer
from your client, Yale Strogoff, in connection with our
investigation of criminal offenses in the scrap materials industry.
The terms under which the contemplated proffer will be received are
as follows:

     1.   No statements made or other information provided by Yale
Strogoff will be used by the U.S. Attorney directly against him or
directly against his son Stephen Strogoff, except for purposes of
cross-examination and/or impeachment should Yale Strogoff offer in
any proceeding statements or information different from statements
made or information provided by him during the proffer, or in a
prosecution of Yale Strogoff based on false statements made or
false information provided by Yale Strogoff.

     2.   The government may make derivative use of, or may pursue
any investigative leads suggested by, any statements made or other
information provided by Yale Strogoff in the course of the proffer.
Any evidence directly or indirectly derived from the proffer may be
used against him and others in any criminal case or other
proceeding.  This provision is necessary in order to eliminate the
possibility of a hearing at which the government would have to
prove that the evidence it would introduce is not tainted by any
statements made or other information provided during the proffer.
See Kastigar v. United States, 406 U.S. 441 (1972).



GOVERNMENT
EXHIBIT
D - 2 PAGES
HUFTALEN

The U.S. Attorney is not hereby agreeing that he will subsequently enter into a plea or immunity agreement with your client.  The foregoing is the complete agreement between your client and the U.S. Attorney with regard to your client's proffer.

Very truly yours,

Michael J. Sullivan
United States Attorney

By: _____

SAMUEL W. BUELL
Assistant U.S. Attorney

*7-21-01*

*ARNOLD H. HUFTALEN AUSA*
*USAO DN.H.*

Acknowledged and agreed to:

_____
YALE STROGOFF

_____
WILLIAM A. BROWN
Counsel for YALE STROGOFF

9/26/01
DATE

9/26/01
DATE

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )    Criminal No. 03-10198-RWZ
          v.             )
                         )
YALE STROGOFF,           )
          Defendant      )

## AFFIDAVIT OF TIMOTHY J. SAUNDERS

. I, Timothy J. Saunders, do hereby depose and say:

1.    I have been employed as a Special Agent with the
Internal Revenue Service in Boston since July, 1999. From
January, 1991 until July, 1999 I was employed by the Internal
Revenue Service as a Revenue Agent. I am the Special Agent
assigned to a criminal investigation and prosecution relating to
Yale Strogoff. I make this affidavit in support of the
opposition of the United States to defendant Strogoff's Motion to
Dismiss the Indictment.

2.    I have been assigned to the Strogoff investigation
since it began during the summer of 2000. The Strogoff
investigation began as an expansion of an existing tax and money
laundering investigation in our office involving Edward Cronin,
the owner of Cronin's Tavern, who conducted a lucrative check
cashing service from a bar in South Boston. In connection with
the review of records relating to the Cronin's Tavern
investigation, IRS Special Agents observed that there were
approximately $235,000 in checks from S. Strogoff & Co. cashed at
Cronin's Tavern during 1998. This information provided the basis

for the opening of the Strogoff investigation.  Assistant U.S.
Attorney Samuel Buell was the initial AUSA assigned to the
investigation.

    3.    On August 8, 2000 I served a grand jury subpoena on
Yale Strogoff at his place of business, S. Strogoff & Co., 315
Third Street, Chelsea, MA.  This subpoena was directed to the
Keeper of the Records, S. Strogoff & Co., Inc. and called for the
production of numerous documents relating to the time period
1996-1998.  A copy of that subpoena is attached hereto as Exhibit
A.  I attempted to interview Mr. Strogoff at that time but he
declined to be interviewed after contacting his civil attorney,
Sol Feldman.  I was later informed by Mr. Feldman that Attorney
William A. Brown would be representing Mr. Strogoff in connection
with this investigation.  Over the period August to October,
2000, Mr. Brown made available to me numerous records of S.
Strogoff & Co. responsive to the grand jury subpoena.  Among the
documents I received were the cancelled checks of S. Strogoff &
Co. for the period 1996-1998.  I sent those checks to an IRS
transcription center and had various information on the checks
inputted into a database.  In or about February, 2001 I received
the reports from that database relating to those checks.

    4.    In or about April, 2001 I spoke with IRS Special Agent
Jeff Landon who told me he had recently served a grand jury
subpoena on S. Strogoff & Co. for certain documents relating to

Robert Stalker and Stalker's company, Robert's Dismantling and Recycling Corp. Landon told me the subpoena had been issued as part of an investigation he was conducting with Assistant U.S. Attorney Arnold Huftalen from the District of New Hampshire. Landon said that Strogoff had told him he did not have the records responsive to the subpoena which Landon had served on him, because he had already produced the records to me in response to the subpoena I had served on Strogoff.

5.    During June, 2001, I manually reviewed the checks of S. Strogoff & Co. for the years 1996 to 1998 to see if I could glean any patterns from the checks. One of my observations was that there seemed to be a large number of checks which were cashed at Broadway National Bank (BNB) in Chelsea, MA, which were made payable to names which had the initials "RK" and "BK". On July 11, 2001 I went to BNB with some of these checks and was directed to Maria Ciampa and Heidi Pujals as having been the tellers who cashed these checks. They told me that they recalled that there were two brothers who used to cash large checks drawn on the account of S. Strogoff & Co. One of them recalled that one of the brothers had a daughter who had died from cancer.

6.    During August, 2001, I went through the S. Strogoff & Co. weigh slips which had been produced in response to subpoena. I noticed the name "Kradin" written on several weigh slips which were associated with checks made payable to names which had the

3

initials "RK" and "BK."  I did Lexis internet research and

discovered information that there was an individual by the name

of Richard Kradin who was the President of a local metal company,

who had a daughter who had died from cancer, and who had a

brother by the name of Robert Kradin.  On August 21, 2001, I went

back to BNB with pictures of Richard and Robert Kradin, which I

showed to Maria Ciampa and Heidi Pujals.  They identified the

persons in the pictures as being the two brothers who had

previously cashed S. Strogoff & Co. checks at BNB.

        7.    On September 26, 2001, I participated in an interview

of Yale Strogoff at the United States Attorney's Office in

Boston, MA.  Present for the United States were myself, Sam

Buell, AUSA Arnold Huftalen from New Hampshire and IRS Special

Agent Jeff Landon.  Mr. Strogoff was accompanied by two

attorneys, William Brown and Solomon Feldman.  This interview was

conducted pursuant to a proffer letter agreement which Mr.

Strogoff and the attorneys signed that day.  During this

interview Strogoff confirmed that he had done business with

Kradin Metal Company for a number of years and that he had paid

the Kradins for the metal with checks made payable to fictitious

names.  Strogoff also acknowledged that he was aware that the

Kradins cashed the checks they received from S. Strogoff & Co. at

Broadway National Bank, but he denied ever discussing that

practice with the Kradins.

                                4

8.   On November 8, 2001, a grand jury subpoena was issued
to the Keeper of the Records of Kradin Metal Company, Inc.
calling for production of various records relating to the years
1996 to 1998 involving the Company's business with S. Strogoff &
Co.  I served that subpoena on James Mulhern, a civil attorney
representing Kradin Metal.  On November 26, 2001 I spoke with
Robert George, a criminal defense lawyer, who told me he was
representing Richard Kradin in connection with the subpoena.  Mr.
George subsequently produced documents to me in response to that
subpoena.  On January 3, 2002 I attended a meeting at the United
States Attorney's Office in Boston, MA, between Robert George and
AUSA Samuel Buell, in which Mr. George indicated that the Kradins
would be willing to cooperate to attempt to resolve the
investigation.

9.   On January 4, 2002, I attended a further interview of
Yale Strogoff at the United States Attorney's Office in Boston,
MA.  Mr. Strogoff was accompanied by William Brown, Solomon
Feldman and Kate Miller.  Present for the government were myself,
Sam Buell and Jeffrey Landon.  During that interview Mr. Strogoff
provided more detailed information relating to his relationship
with the Kradins, among other matters.

10.  In March, 2002, Sam Buell informed me he was being
assigned to the Department of Justice's Enron Task Force and that
the Strogoff investigation was going to be reassigned within the

United States Attorney's Office.  I was subsequently informed
that Assistant U.S. Attorney Peter Mullin would be handling the
Strogoff matter.

11.  On July 19, 2002, I attended a meeting at the United
States Attorney's Office with Yale Strogoff and his attorneys,
William Brown and Solomon Feldman.  Present for the government
was myself, AUSA Peter Mullin and an intern working with him.
Prior to this meeting I had prepared some schedules of the tax
loss to the United States based on the checks which S. Strogoff &
Co. had paid to the Kradins, as well as two other customers,
Joseph Berardi (NASD) and Crystal Steel Company (John Diamont).
The purpose of our meeting was to go through my tax loss
schedules and the supporting documents so that the defendant and
his counsel could understand how I arrived at the numbers I had.
During that meeting Mr. Brown indicated that my analysis with
regard to the Kradins was correct, but he was disputing my
analysis relating to Berardi and John Diamont of Crystal Steel
Company.  He asked to see additional documents from Prolerized
New England, which AUSA Mullin agreed to provide to the
defendant.

12.  At no time prior to the return of the indictment in
this case was I aware of the C&J Trucking investigation in New
Hampshire.  I was aware, however, that Mr. Brown claimed that Mr.
Strogoff had once obtained immunity in connection with a New

6

Hampshire investigation.  On August 24, 2000 I attended a meeting

at the United States Attorney's Office in Boston, MA, between Sam

Buell and Attorney William Brown.  This was the first meeting

with Mr. Brown after we had served the subpoena for records on

Strogoff and much of the focus of the meeting was on document

production issues.  During the course of that meeting Mr. Brown

indicated that Strogoff had information regarding illegal acts

committed by others.  Brown said that Strogoff would be willing

to cooperate if he was granted immunity by the United States

Attorney's Office in Massachusetts, as he had been in New

Hampshire a few years ago.  AUSA Buell told Mr. Brown that the

current investigation was different from the New Hampshire

investigation because in this matter Mr. Strogoff was the subject

of the investigation.  Mr. Buell indicated that he was willing to

have a proffer interview with Mr. Strogoff to determine what

information he could provide.  Attached hereto as Exhibit B is a

copy of a memorandum I prepared relating to this August 24, 2000

meeting.

        13.  Prior to the return of the indictment in this case, I

had never heard of the C&J Trucking case or that a subpoena had

been served on Strogoff relating to that case.  I have never

received any information from the United States Attorney's Office

for the District of New Hampshire relating to Yale Strogoff or

the C&J Trucking matter.  To the best of my recollection the only

                                7

time I ever met AUSA Arnold Huftalen was at the September 26, 2001 proffer interview of Yale Strogoff. I do not believe I have ever spoken with AUSA Huftalen on the telephone. AUSA Mullin has informed me recently, in connection with the defendant's motions for discovery and inspection and this motion to dismiss, that the investigators on the C&J Trucking matter were New Hampshire State Police Sergeant Charles Forsaith, Sergeant Wayne Peasley of the New Hampshire Division of Highway Enforcement and Special Agents Jeffrey Cimahosky and Steven Piwowarski of the U.S. Department of Transportation, Federal Motor Carrier Safety Administration. To the best of my knowledge, information and belief, I have never met or spoke with any of the investigators who worked on the C&J Trucking matter nor was I ever provided with any reports of interview or other documents from that investigation. To the best of my knowledge, information and belief, none of the information which we gathered in the course of the Yale Strogoff investigation, and/or presented to the grand jury in connection with that matter, comes, directly or indirectly, from the C&J Trucking investigation in New Hampshire.

Sworn to under the pains and penalties of perjury, this 31ST of October, 2003 at Boston, MA.

TIMOTHY J. SAUNDERS
Special Agent

8

AO 110 (Rev.     1 Subpoena to Testify Before Grand Jury

# United States District Court

## DISTRICT OF MASSACHUSETTS

TO:     S. Strogoff and Co., Inc.
Attn: Yale Strogoff
315 Third Street
Chelsea, MA 02150

## SUBPOENA TO TESTIFY
## BEFORE GRAND JURY

SUBPOENA FOR:
☐ PERSON     ☒ DOCUMENT(S) OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | COURTROOM |
|---|---|
| Suite 9200<br>1 Courthouse Way<br>Boston, MA 02210 | Grand Jury Room<br>10th Floor |
| | DATE AND TIME August 17, 2000 |
| | 10:00 a.m. |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*
See Attachment.

In lieu of an appearance before the Grand Jury, the subpoenaed records may either be mailed via Certified Mail to the undersigned attorney at the address listed below or delivered to an authorized agent of the U.S. Attorney's Office.

☐ *Please see additional information on reverse*

GOVERNMENT
EXHIBIT
A
Saunders A.S.

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| TONY ANASTAS | |
| (BY) DEPUTY CLERK | July 27, 2000 |

This subpoena is issued on application
of the United States of America

DONALD K. STERN
UNITED STATES ATTORNEY

NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY:
SAMUEL W. BUELL
Assistant U.S. Attorney
United States Attorney's Office
Suite 9200, 1 Courthouse Way
Boston, MA 02210   (617) 748-3100

*If not applicable, enter 'none'

AO 110 (Rev. 12/89) Subpoena to Testify Before Grand Jury

| RETURN OF SERVICE (1) | | | |
|---|---|---|---|
| RECEIVED BY SERVER | DATE 7/31/2000 | PLACE USRO 1 Courthouse Way Suite 9200 Boston, MA 02110 | |
| SERVED | DATE 8/8/2000 | PLACE S. Frogoff and Co. Inc 315 Third Street Chelsea, MA 02150 | |

SERVED ON (PRINT NAME)

Yale Strogoff

| SERVED BY (PRINT NAME) Timothy J. Saunders | TITLE Special Agent |
|---|---|

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

### DECLARATION OF SERVER (2)

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ___8/8/2000___
Date

Signature of Server ___Timothy J. Saunders___

JFK Federal Building, Room 1000
PO Box 9092
Boston, MA 02203
Address of Server

ADDITIONAL INFORMATION

(1) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.

(2) "Fees and mileage need not be tendered to the witness upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure; Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)".

ATTACHMENT TO SUBPOENA ISSUED TO: S. Strogoff & Co., Inc.

FOR THE YEARS: 1996 - 1998

All corporate records and books of account relative to the financial transactions of S. STROGOFF & Co., Inc.

To include but not limited to:

ALL CORPORATE BOOKKEEPING RECORDS and other financial records including General Ledger, General Journals, all Subsidiary Ledgers and Journals, Gross Receipts and income records, Cash Receipts and Disbursement records and/or Journals, sales and Purchase records and/or Journals, Accounts Receivable and Payable Ledgers and records, Bad Debt records, Cost of Goods Sold records, Loan Receivable and Payable Ledgers, Voucher Register and all sales and expense invoices including all invoices documenting expenses paid by cash (currency ) or bank check (cashier or teller checks) and retained copies of any bank checks (cashier or teller checks.)

Inventory records establishing beginning and ending inventories including inventory sheets, work-papers, and valuation records. Records and work-papers reflecting the purchase, basis and depreciable life of assets. Records and work-papers of sales of corporate assets such records disclosing the dates of purchase and sale, cost and sales price, records establishing or adjusting asset basis.

Corporate Minute Book, Stock Register or other records reflecting ownership of corporate stock. All financial statements, bookkeeper's and/or accountant's workpapers used in the preparation of corporate records or tax returns. Retained copies of all federal and state income, payroll and excise tax returns.

SAVINGS ACCOUNT RECORDS: Including passbooks or bank statements, records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, records reflecting the identity of checks deposited, withdrawal slips, and records disclosing the disposition of withdrawals, Forms 1099, debit and credit memos. Records of any certificates of deposit, money market certificates, U.S. Treasury Notes or Bills purchased.

CHECKING ACCOUNT RECORDS: Including bank statements, deposit slips, records revealing the identity of checks drawn on the account, checks deposited, all debit and credit memos, and Forms 1099 issued.

LOAN RECORDS: Including applications, financial statements, loan collateral, credit and background investigations required, loan agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loans correspondence files and internal memoranda relative to these loans.

RECORD FORMAT: In addition to hard copies, records are requested in the form of magnetic media. Data may be provided in 3 1/2 inch diskette, 8mm tape, or 9 track tape, in ASCII delimited format. A record layout for the data is also requested.

## ADVICE OF RIGHTS

1.  The Grand Jury is conducting an investigation of possible violations of federal criminal laws involving:

    | | | |
    |---|---|---|
    | 18 U.S.C. § 1955 | - | Illegal Gambling |
    | 18 U.S.C. §§ 892 & 894 | - | Extension and Collection of Unlawful Debt |
    | 18 U.S.C. § 1956 | - | Money Laundering |
    | 18 U.S.C. § 371 | | Conspiracy |

2.  You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.

3.  Anything that you do say may be used against you by the Grand Jury or in a subsequent legal proceeding.

4.  If you have retained counsel, the Grand Jury will permit you a reasonable opportunity to step outside the Grand Jury room to consult with counsel if you so desire.

**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Contact**



| | | | |
|---|---|---|---|
| **In Re:** | YALE STROGOFF | **Location:** | United States Courthouse, Suite 9200 |
| **Investigation #:** | 040030185 | | 1 Courthouse Way |
| **Date:** | August 24, 2000 | | Boston, MA 02210 |
| **Time:** | 10:05 - 10:15 am | | |
| **Participant(s):** | William Brown, Defense Attorney | | |
| | Sam Buell, Assistant United States Attorney | | |
| | Timothy Saunders, Special Agent | | |
| | Mary Chin, Special Agent | | |

On Thursday, August 24, 2000, Assistant United States Attorney Sam Buell, Special Agent Timothy Saunders, and Special Agent Mary Chin met with William Brown at the above address. William Brown requested the meeting for the purpose of discussing the magnitude of information included in subpoenas served by Special Agent Timothy Saunders in regards to S. Strogoff and Company, Inc., and Strogoff Steel Trading Corp. on Tuesday, August 8, 2000.

Brown requested the scope of the subpoena be narrowed. He claimed the business generates a great deal of paperwork. A large amount of the paperwork will not be needed to conduct the investigation. Narrowing the scope of the subpoenas would ease his client's burden in retrieving and organizing the records.

Buell responded by stating the subpoenas served were not too broad. Although STROGOFF may have a large amount of records, the government is prepared for this circumstance. Large amounts of paperwork are common to tax investigations. The books and records relative to each business should not be too voluminous.

Buell agreed to have Special Agent Saunders review the books and records at either STROGOFF's place of business or Brown's law office prior to transfer. The books and records deemed necessary to the investigation will be determined at that point. It will also provide Brown and/or STROGOFF an opportunity to photocopy any books and records taken.

Brown expressed concern over possible charges included on the "Advice of Rights" pages of the subpoenas served. He claimed STROGOFF is not involved in illegal gambling, loan sharking, or money laundering. However, STROGOFF is nervous seeing his name associated with this type of an investigation.

Buell indicated those charges apply to the overall grand jury investigation. No evidence has been examined to date suggesting STROGOFF was involved in any such crimes. However,



GOVERNMENT
EXHIBIT
B

STROGOFF is being investigated for the possible evasion of income taxes.

Brown stated everybody in STROGOFF's industry deals in cash. This is not a crime (cited Grant case). However, STROGOFF has information regarding illegal acts committed by others. He requested the names of others that are part of the grand jury investigation for the purpose of providing this information. STROGOFF would be willing to cooperate if he was granted immunity by the United States Attorney's Office as he was in New Hampshire a few years ago.

Buell stated this case is different than the investigation in New Hampshire because STROGOFF is an actual subject of this investigation. He wanted to limit today's discussion to the investigation of STROGOFF. The other subjects of the investigation will not be revealed. However, if STROGOFF comes forth with pertinent information regarding a federal crime that was committed, the United States Attorney's Office may accept a proffer agreement.

Buell stated further that STROGOFF is a spin-off case from an existing grand jury investigation. STROGOFF's case differs from that investigation since his case focuses on tax issues. He doubts any information STROGOFF can provide relative to the other subjects in the investigation would be fruitful.

I prepared this memorandum on August 24, 2000, after refreshing my memory from notes made during the contact with William Brown.

Timothy J. Saunders
Special Agent

Defendant        )

## AFFIDAVIT OF PETER A. MULLIN

I, Peter A. Mullin, hereby depose and say:

1.    I am employed as an Assistant United States Attorney in the District of Massachusetts and have been so employed since August, 1983.  I am assigned to the prosecution of the Strogoff case.  I make this affidavit in support of the opposition of the United States to defendant Yale Strogoff's Motion to Dismiss the indictment.

2.    In early March, 2002 I was assigned responsibility for a tax investigation involving Yale Strogoff, a Chelsea, MA scrap metal dealer, and several of his customers.  IRS Special Agent Timothy J. Saunders was the case agent on the investigation. Assistant U.S. Attorney Samuel Buell had handled the Strogoff matter prior to me, but he was transferring to the United States Department of Justice's Enron Task Force.

3.    William A. Brown has been the attorney for Yale Strogoff throughout my involvement in this case.  On May 28, 2002 I had a telephone conversation with Mr. Brown in which I told him that the United States was interested in Mr. Strogoff's

cooperation with regard to the criminal prosecution of his
customers.  I told Mr. Brown that we were not willing to enter
into an immunity or non-prosecution agreement with Mr. Strogoff
in connection with this matter, but we were willing to do a plea
agreement, in which Mr. Strogoff would plead guilty to a criminal
offense, and we would be prepared to make a motion for a downward
departure pursuant to U.S.S.G. §5K1.1, based on Mr. Strogoff's
substantial assistance in connection with the prosecution of the
customers.  Mr. Brown said Mr. Strogoff had been cooperating.  He
asked that I send him information relating to what we were
alleging the tax loss was with regard to this matter.  I sent
Mr. Brown summary schedules which had been prepared by IRS
Special Agent Timothy Saunders, showing the alleged tax loss for
the Kradins, as well as two other customers, Joseph Berardi and
John Diamont.

    4.    On May 29, 2002 I had a telephone conversation with
Mr. Brown in which he asked me for more detailed information as
to how Special Agent Saunders had arrived at the figures
contained in the schedule I had sent him.  On June 5, 2002 I sent
Mr. Brown a letter providing a more detailed explanation as to
how we had arrived at the figures we had.  Mr. Brown got back in
touch with me and requested that we provide him with the
underlying checks and other documentation for our figures.  I
sent that information to him on June 20, 2002.

5.    On July 19, 2002 I met with Yale Strogoff and his
attorneys, William Brown and Solomon Feldman, at the United
States Attorney's Office.  I was accompanied by Special Agent
Saunders and a law student who was working with me that summer as
an intern.  The purpose of the meeting was to review the
information I had provided to Mr. Brown relating to the tax loss
attributable to Mr. Strogoff in connection with three customers:
The Kradins, Joseph Berardi and John Diamont.  During this
meeting we reviewed various checks and weigh slips to explain how
we were attributing certain checks to certain customers.  Mr.
Brown requested that we provide him with copies of certain
documentation from Prolerized New England, which I sent to Mr.
Brown on July 24, 2002.

6.    On August 22, 2002 Richard and Robert Kradin appeared
at the United States Attorney's Office, with their attorney,
Robert George, for proffer interviews.  Mr. George had been
telling me for several months that his clients were willing to
plead guilty, cooperate, and testify against Mr. Strogoff, in
return for a U.S.S.G. §5K1.1 motion for a downward departure.
Special Agent Saunders and I interviewed Richard and Robert
Kradin, separately, on August 22, 2002 and they provided
substantial evidence implicating Yale Strogoff in a conspiracy to
defraud the United States by impairing the Internal Revenue
Service in connection with the collection of taxes.  Following

3

these proffer interviews, I prepared proposed plea agreement letters with Richard and Robert Kradin, got them approved within the United States Attorney's Office, and sent them to Robert George for he and the Kradins to execute.  I subsequently received the plea agreement letters back from Mr. George, with the signatures of Richard and Robert Kradin dated September 10, 2002.

    7.  On December 3, 2002 I filed a criminal Information in United States District Court in Boston, MA, charging Richard and Robert Kradin with having filed false individual and corporate tax returns for the years 1996 to 1998.  It had taken from September to December, 2002 for the Special Agent to prepare his report relating to the case, obtain internal approvals within the Internal Revenue Service, and the approval of the Tax Division and the United States Attorney's Office.  On February 12, 2003, Richard and Robert Kradin pled guilty pursuant to their plea agreements.  On February 27 and March 6, 2003, respectively, Richard and Robert Kradin testified before the grand jury relating to their dealings with Yale Strogoff.  They were sentenced on June 10, 2003.

    8.  On November 27, 2002 and May 6, 2003, I issued grand jury subpoenas to the Keeper of the Records, S. Strogoff & Co., calling for the production of records relating to the years 1999, 2000 and 2001.  Mr. Brown accepted service of these subpoenas on

4

behalf of the company.  S. Strogoff & Co. produced records
responsive to these subpoenas on January 9 and May 15, 2003.

9.  On June 5, 2003 the grand jury returned a one count
Indictment charging Yale Strogoff with having conspired with
Richard and Robert Kradin to impair and impede the Internal
Revenue Service.  I had presented the Strogoff matter to the
grand jury over the period June 20, 2002 to June 5, 2003.  In
addition to Richard and Robert Kradin, the grand jury heard the
testimony of Special Agent Saunders, as well as present and
former employees of S. Strogoff & Co. and present and former
employees of Broadway National Bank.  While AUSA Sam Buell was
assigned to the investigation, he placed one witness, Jane
Lemlin, S. Strogoff & Co.'s bookkeeper, in the grand jury.  He
used a Strike Force Grand Jury for that testimony.  I did not
recall Ms. Lemlin to testify before the grand jury which returned
the indictment in this case.

10.  On July 24, 2003 Yale Strogoff was arraigned on the
Indictment in this case and pled not guilty.  The Magistrate
Judge set the initial status conference in the case for September
12, 2003.  On September 10, 2003 I had a telephone conversation
with William Brown in which he advised me that defendant Strogoff
claimed he was previously immunized in New Hampshire.  This was
the first I had heard of this claim.  Mr. Brown provided me with
no details relating to this alleged immunity.

11.  On September 12, 2003, at the initial status conference in this case, defendant Strogoff filed a Motion for Discovery and Inspection which requested, among other things, information relating to the investigation in New Hampshire involving C&J Trucking Co., Inc., case number 97-CR-129.  I had never heard of the C&J Trucking case prior to receiving this motion.  Following the initial status conference I called AUSA Huftalen in New Hampshire.  He told me that the C&J Trucking case had grown out of a fatal car/truck accident on Route 93 in New Hampshire and that the federal prosecution related to C&J Trucking Co.'s failure to abide by federal law and regulations relating to the number of hours that a truck driver could work.  He said he had some recollection that there had been a subpoena to Strogoff for records in connection with the C&J case, but he had no recollection of Strogoff having testified in the grand jury in New Hampshire.

12.  On or about September 26, 2003, I received a copy of defendant Strogoff's Memorandum In Support of Defendant's Motion For Discovery and Inspection, which had attached to it as Exhibit A, what purported to be a November 22, 1996 letter from AUSA Arnold H. Huftalen to Yale Strogoff with a subject heading "Nonprosecution Agreement."  I have attached a copy of that memorandum and letter to this affidavit as Exhibit A.  I noticed when I reviewed the November 22, 1996 letter it was unsigned by

6

AUSA Huftalen and it appeared to be internally inconsistent, since the first page had the date November 22, 1996, while the third page had the date November 20, 1996. I faxed a copy of the defendant's Memorandum and this letter to AUSA Huftalen on September 26, 2003. AUSA Huftalen and I spoke on September 26, 2003 and he told me his file for the C&J Trucking matter indicated that he had faxed a proposed nonprosecution agreement to Brown relating to Yale Strogoff in connection with the C&J Trucking matter. Huftalen said, however, he had no memory of ever interviewing or debriefing Strogoff in connection with the C&J matter. He said he would review his file further.

13. On October 10, 2003 Magistrate Judge Cohen conducted the final status conference in this case. At that conference I was served with a copy of defendant Strogoff's Motion To Dismiss the Indictment in this case. After that hearing I faxed a copy of that motion to AUSA Huftalen in New Hampshire. I subsequently asked AUSA Huftalen to prepare an affidavit which I could use in opposing the motion. I had previously asked him to be in touch with the investigative agents who had worked on the C&J Trucking matter to see if they had any memory of ever interviewing Yale Strogoff in connection with that case. I had also asked AUSA Huftalen to check to see whether any agency involved in the C&J Trucking matter, other than his office, had files relating to the C&J Trucking case. The affidavit, which is attached as Exhibit 1

7

to the Government's Opposition to Defendant's Motion to Dismiss, is the affidavit which I received from AUSA Huftalen pursuant to my request.

14.  I had never heard of the C&J Trucking matter prior to the initial status conference in this case on September 12, 2003. I have never spoken with any of the investigators in the C&J Trucking case and I never discussed that matter with AUSA Huftalen prior to September 10, 2003.  AUSA Huftalen has never provided me with any documents or other information which Yale Strogoff provided to him in connection to the C&J Trucking matter.  To the best of my knowledge, information and believe none of the evidence which we presented to the Grand Jury in connection with this case was received, directly or indirectly, from Yale Strogoff in connection with the C&J Trucking case.

Sworn to under the pains and penalties of perjury this 31st day of October, 2003 at Boston, MA.

PETER A. MULLIN
Assistant U.S. Attorney

8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO:03-10198-RWZ.

UNITED STATES OF AMERICA )
)
v. )
)
YALE STROGOFF )
)

GOVERNMENT
EXHIBIT
A
Mullin Ass.

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR DISCOVERY AND INSPECTION

Now comes the defendant, Yale Strogoff, in the above-captioned matter and respectively submits, pursuant to Fed. R. Crim. 16 and Rules 116.1 of the Local Rules of United States District Court for the District of Massachusetts, the following memorandum in support of Defendant's previous Motion for Discovery and Inspection. That motion requested that this Honorable Court order the government to furnish to the defendant the following: All interviews and debriefing of Yale Strogoff in the United States Attorney's Office in Concord, NH , stemming from the investigation in the District of New Hampshire involving C&J Trucking Co.,Inc., case no. 97-cr-129. This Honorable Court should grant defendant's motion for the reasons set forth below.

### Facts

Defendant Yale Strogoff was indicted by a Grand Jury on June 5, 2003 in the District of Massachusetts.  A prior investigation in and around 1996 in New Hampshire involved Yale Strogoff's cooperation with United States Attorney's Office in New Hampshire.  In a letter originally dated November 22, 1996, and faxed to undersigned counsel on December 3, 1996, the government signed a "Nonprosecution Agreement" in the State of New Hampshire. This agreement was made in turn for Yale Strogoff's cooperation in the then ongoing investigation in the District of New Hampshire involving C&J Trucking Co., Inc.  This agreement specifically stated that "It is understood that if you fully comply with the terms and conditions of this agreement, and continue to render full cooperation and completely truthful testimony, no charge will be placed against you

by the United States Attorney's Office for the District of New Hampshire or the District of Massachusetts for any violation of federal laws, relating to the ongoing investigation or revealed by you during your cooperation except for any crime(s) of violence." (letter dated November 22, 1996, faxed December 3, 1996 p.2) This letter was signed and agreed to by the government and Yale Strogoff on December 6, 1996. (see Exhibit A, attached hereto.) Yale Strogoff then gave interviews to the United States Attorneys Office in New Hampshire, as a result of this nonprosecution agreement.

## Standard of Review

In the case of Kastigar v. United States, 406 U.S.441 (1972), the Supreme Court held that, "Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." Id. at 453. In addition, the Court further held that, "We conclude, moreover, that in order to implement this constitutional rule and accommodate the interest of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits." Id. at 456.

## Application

The evidence derived directly and indirectly from compelled testimony is afforded protection. In this case, the compelled testimony may have lead to the infliction of criminal penalties on Yale Strogoff as a witness. This is why this Honorable Court must grant defendant's motion to make available all interviews of Yale Strogoff stemming from that investigation.

## Conclusion

Yale Strogoff prays that this Honorable Court allow his motion to Discovery and Inspection, attached hereto, and filed on September 16, 2003.

Yale Strogoff
by his attorney,

William A. Brown
31 Milk Street, 5th Floor
Boston, MA 02109

## CERTIFICATE OF SERVICE

I, William A. Brown, hereby certify that I have served the foregoing motion on Assistant United States Attorney, Peter Mullin, by first class mail on this the _25_ day of September 2003

William A. Brown



**U.S. Department of Justice**

*United States Attorney*
*District of New Hampshire*

Federal Building                                           603/225-1552
55 Pleasant Street, Room 312
Concord, New Hampshire 03301

November 22, 1996

Yale Strogoff                                    **SENT VIA FAX AND U.S. MAIL**
c/o William Brown, Esquire
50 Milk Street, 19th floor
Boston, MA 02109

<u>NONPROSECUTION AGREEMENT</u>

Dear Mr. Strogoff:

        This letter will serve to memorialize an agreement reached between you and the United
States Attorney's Office for the District of New Hampshire (herein after the "government"). It is
understood that this agreement is made with a view to your cooperating with the government in
ongoing criminal investigations in the District of New Hampshire involving C&J Trucking Co.,
Inc.

        Based upon your attorney's representation that you will assist the federal government and
law enforcement agencies conducting the investigation, the government hereby agrees to extend
to you the following terms and conditions:

        1.  No testimony or other information provided by you to government attorneys or law
enforcement officers or any federal grand jury conducting this investigation, or to the Court,
whether in the nature of testimony or debriefing interviews or active cooperation with law
enforcement officers, will be used against you in any criminal case, except a prosecution for
perjury of giving a false statement or subsequent obstruction of justice, should you give false
information or testimony.  If you should violate the terms of this agreement, any such testimony
or other information provided by you to attorneys or investigators may, and will, be used against
you.  No statements or other information provided by you shall be deemed to be precluded from
use against you in the event of your breach of this agreement.  In the event of breach of this
agreement, you shall be subject to prosecution not only for perjury or giving a false statement, but
also for any federal criminal violations of which the government has any knowledge.  This
agreement covers all information provided by you, in any form, from the date you began your
cooperation with the government, which is the date of this agreement.

2.   This agreement is in lieu of a formal immunity order under 18 U.S.C. Section 6001, et seq.  This agreement does not and shall not be construed to impose any duty or limitation, except as expressly set forth herein, on the government beyond that which would be imposed if a formal immunity order were to be issued by the U.S. District Court, immunizing any information or testimony you provide.

3.   You must supply complete and truthful information to the attorneys and law enforcement officers of the government.  You must supply completely truthful testimony to any federal grand jury conducting this and related investigations, as well as in any other proceeding related to or growing out of this investigation, including all court and jury trials.  You must answer all questions concerning the subject matter and identities of persons involved in this and related investigations, and must not withhold any information.  You must neither attempt to protect any person or entity through false information or omission, nor falsely implicate any person or entity.

4.   No statements made by you during your cooperation will be used against you, if you do not breach this agreement.  The government may make derivative use of and may investigate any leads provided by your information, and use any information derived from those leads against other persons.  Also, if you at any time testify contrary to any information you provide to investigators, all statements made by you may be used to cross-examine you.

5.   This agreement is limited to those statements made by you concerning acts committed prior to the date of this agreement, and does not limit in any way the right or ability of the government, to prosecute any offenses which you may commit after the date of this agreement.  This agreement is also not applicable to any violent crimes you may have committed prior to this agreement of which the government is unaware.

6.   It is understood that if you fully comply with the terms and conditions of this agreement, and continue to render full cooperation and completely truthful testimony, no charges will be placed against you by the United States Attorney's Office for the District of New Hampshire for any violations of federal laws, relating to the ongoing investigation or revealed by you during your cooperation except for any crime(s) of violence.  If you have engaged in any crime(s) of violence you can and will be prosecuted regardless of any other provisions of this agreement.

7.   Any breach of this agreement will be determined in the sole discretion of the United States Attorney for the District of New Hampshire.

8.   This agreement constitutes the full and complete understanding among the parties.  There shall be no modification to this agreement unless made in writing and signed by all parties.

OR THE DISTRICT OF MASSACHUSETTS

WAB

9.   I, Yale Strogoff, have read this agreement and understand the terms and conditions, and fully and voluntarily agree to them.

Arnold H. Huftalen
Assistant U.S. Attorney

Date:  November 20, 1996

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO:03-10198-RWZ.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| YALE STROGOFF ) | |
| ) | |

## MOTION FOR DISCOVERY AND INSPECTION

Now comes the defendant, Yale Strogoff, in the above-captioned matter and respectively moves that this Honorable Court order the government to furnish to the defendant the following:

1. All interviews and debriefing of Yale Strogoff in the United States Attorney's Office in Concord, NH , stemming from the investigation in the District of New Hampshire involving C&J Trucking Co.,Inc., case no. 97-cr-129.

Yale Strogoff
by his attorney,

William A. Brown
31 Milk Street, 5th Floor
Boston, MA 02109

## CERTIFICATE OF SERVICE

I, William A. Brown, hereby certify that I have served the foregoing motion on Assistant United States Attorney, Peter Mullin, by hand on this the 16th day of September 2003

William A. Brown

**EXHIBIT D**

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:03-cr-10198-RWZ-1

Case title: USA v. Strogoff                    Date Filed: 06/05/2003

| Date Filed | # | Docket Text |
|---|---|---|
| 06/05/2003 | 1 | INDICTMENT as to Yale Strogoff (1) count(s) 1. (Diskes, Sheila) (Entered: 06/05/2003) |
| 06/05/2003 | 2 | Judge Rya W. Zobel : ORDER REFERRING CASE to Magistrate Judge Lawrence P. Cohen Reason for referral: PRETRIAL as to Yale Strogoff (Diskes, Sheila) (Entered: 06/05/2003) |
| 06/24/2003 | 3 | MOTION to Continue as to Yale Strogoff . filed cs(Johnson, Jay) (Entered: 06/25/2003) |
| 07/24/2003 | | Judge Lawrence P. Cohen : Electronic ORDER entered granting 3 Motion to Continue Arraignment and Initial appearance to 7/24/03 at 3:15. (Welch, Ruth) (Entered: 07/24/2003) |
| 07/24/2003 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Cohen :Arraignment as to Yale Strogoff (1) Count 1 held; pleads not guilty; bail hearing held: defendant released on personal recognizance; travel restricted to continental USA; notify Pretrial Services of plans to travel to/from FL; passport surrendered to Pretrial Services in open court; obtain no other; scheduling order to issue. (Attys. Mullin, Brown; PTSO September Brown) (Tape #2003-43.) (Hayes, Ellen) (Entered: 07/24/2003) |
| 07/24/2003 | 4 | Judge Lawrence P. Cohen : ORDER entered setting conditions of release: PERSONAL RECOGNIZANCE; see Clerk's Notes for terms. (Hayes, Ellen) (Entered: 07/25/2003) |
| 07/24/2003 | 5 | Judge Lawrence P. Cohen : INITIAL SCHEDULING ORDER entered. Status Conference set for 9/4/2003 02:00 PM in Courtroom 23 before Magistrate Judge Lawrence P. Cohen. Joint memo due 5 days prior. (Welch, Ruth) (Entered: 07/29/2003) |
| 07/24/2003 | 6 | Judge Lawrence P. Cohen : ORDER ON EXCLUDABLE TIME entered. Time excluded from 07/24/03 until 08/21/03. (Welch, Ruth) (Entered: 07/29/2003) |
| 07/24/2003 | 7 | NOTICE OF ATTORNEY APPEARANCE: William A. Brown appearing for Yale Strogoff (Johnson, Jay) (Entered: 08/01/2003) |
| 08/08/2003 | 8 | Governments Letter from Peter Mullin (non-motion) regarding automatic discovery as to Yale Strogoff (Johnson, Jay) (Entered: 08/13/2003) |
| 08/21/2003 | 9 | MOTION to Continue Initial Status Conference as to Yale Strogoff by USA. c/s(Filo, Jennifer) (Entered: 08/27/2003) |

| 09/04/2003 | | Judge Lawrence P. Cohen : Electronic ORDER entered granting 9 Motion to Continue Initial Status Conference to 9/12/03 at 1:45 p.m. (Welch, Ruth) (Entered: 09/04/2003) |
|---|---|---|
| 09/11/2003 | 11 | MEMORANDUM of the Government re initial status conference by Yale Strogoff (Johnson, Jay) (Entered: 09/16/2003) |
| 09/12/2003 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Lawrence P. Cohen :Status Conference held: Dispositive motion(s) to be filed by 10/10/03; FINAL STATUS CONFERENCE SET FOR 10/14/03, 2:00 P.M. (Attys. Mullin, Kate Brown) (Tape #2003-53.) (Hayes, Ellen) (Entered: 09/12/2003) |
| 09/12/2003 | 10 | Defendant's MOTION for discovery and inspectionfiled, c/s. (Hayes, Ellen) (Entered: 09/15/2003) |
| 09/15/2003 | 12 | MEMORANDUM in Opposition by USA as to Yale Strogoff re 10 MOTION for Discovery and inspection.cs (Johnson, Jay) (Entered: 09/16/2003) |
| 09/16/2003 | 13 | MOTION for Discovery and Inspectionas to Yale Strogoff . cs(Johnson, Jay) (Entered: 09/16/2003) |
| 09/25/2003 | 14 | Judge Lawrence P. Cohen : ORDER AND INITIAL STATUS REPORT issued. Status Conference set for 10/14/2003 2:00 PM in Courtroom 23 before Magistrate Judge Lawrence P. Cohen. Joint memo due five days prior.(Welch, Ruth) (Entered: 09/25/2003) |
| 09/25/2003 | 15 | Magistrate Judge Lawrence P. Cohen: MEMORANDUM AND ORDER ON PRETRIAL MOTIONS entered as to 10 Motion for Discovery. (Welch, Ruth) (Entered: 09/25/2003) |
| 09/25/2003 | | Magistrate Judge Lawrence P. Cohen : EXCLUDABLE TIME entered. Time excluded from 09/12/03 until 10/14/03. See document #14. (Welch, Ruth) (Entered: 09/25/2003) |
| 09/26/2003 | 16 | MOTION for Discovery and Inspection as to Yale Strogoff .cs (Johnson, Jay) (Entered: 09/30/2003) |
| 09/26/2003 | 17 | MEMORANDUM in Support by Yale Strogoff re 16 MOTION for Discovery and Inspection. cs (Johnson, Jay) (Entered: 09/30/2003) |
| 09/26/2003 | 18 | MEMORANDUM in Opposition by USA as to Yale Strogoff re 16 MOTION for Discovery and Inspection. cs (Johnson, Jay) (Entered: 09/30/2003) |
| 09/30/2003 | 19 | SUPPLEMENTAL Opposition by USA as to Yale Strogoff re 16 SECOND MOTION for Discovery and Inspection. cs (Johnson, Jay) Modified on 10/1/2003 (Johnson, Jay). (Entered: 10/01/2003) |
| 10/03/2003 | 20 | Magistrate Judge Lawrence P. Cohen : ORDER entered denying 13 Motion for Discovery. (Welch, Ruth) (Entered: 10/03/2003) |
| 10/03/2003 | | Remark: Motion (16) is identical to Motion (13). (Welch, Ruth) (Entered: 10/03/2003) |

| 10/08/2003 | 21 | JOINT MEMORANDUM of the parties re final status conference by Yale Strogoff (Johnson, Jay) (Entered: 10/10/2003) |
| 10/10/2003 | 24 | MOTION to Dismiss as to Yale Strogoff . cs (rec'd for docketing 11/4/03)(Johnson, Jay) (Entered: 11/04/2003) |
| 10/14/2003 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Lawrence P. Cohen :Final Status Conference held: Trial estimated at 5-6 days; motion to dismiss pending, reserved for District Judge; file will be returned for trial. (Attys. Mullin, (Ms.) Brown) (DIGITAL RECORD.) (Hayes, Ellen) (Entered: 10/14/2003) |
| 10/14/2003 | 22 | Magistrate Judge Lawrence P. Cohen : FINAL STATUS REPORT issued, all pretrial matters completed. Response to motion to dismiss due 10/24/03. File returned to Clerk. (Welch, Ruth) (Entered: 10/16/2003) |
| 10/22/2003 | 23 | MOTION for Extension of Time to 10/31/03 to File Response/Reply to defendants motion to dismiss as to Yale Strogoff by USA. (Johnson, Jay) (Entered: 10/23/2003) |
| 10/24/2003 | | Judge Rya W. Zobel : Endorsed ORDER entered granting 23 Motion for Extension of Time to File Response/Reply as to Yale Strogoff (1) (Urso, Lisa) (Entered: 10/24/2003) |
| 10/31/2003 | 25 | MEMORANDUM in Opposition by USA as to Yale Strogoff re 24 MOTION to Dismiss (Johnson, Jay) (Entered: 11/04/2003) |
| 11/04/2003 | 26 | MOTION for Protective Order Regarding Disclosure of Income Tax Records as to Yale Strogoff by USA. (Johnson, Jay) Modified on 11/7/2003 (Johnson, Jay). (Entered: 11/06/2003) |
| 11/07/2003 | | NOTICE OF HEARING ON MOTION as to Yale Strogoff Motion Hearing set for 12/16/2003 02:00 PM in Courtroom 12 before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 11/07/2003) |
| 11/13/2003 | 27 | MOTION for Discovery and Inspection as to Yale Strogoff . (Attachments: # 1 Exhibit A# 2 Exhibit B)(Johnson, Jay) (Entered: 11/13/2003) |
| 11/24/2003 | 28 | MEMORANDUM in Opposition by USA as to Yale Strogoff re 27 MOTION for Discovery and Inspection. (Johnson, Jay) (Entered: 11/25/2003) |
| 12/16/2003 | 29 | JOINT MOTION for Excludable Delay from 10/10/03 to 12/29/03 as to Yale Strogoff by USA, Yale Strogoff. (Johnson, Jay) (Entered: 12/18/2003) |
| 12/16/2003 | 30 | MOTION to Continue hearing until January 2004 as to Yale Strogoff . (Urso, Lisa) (Entered: 12/30/2003) |
| 12/30/2003 | | Judge Rya W. Zobel : Endorsed ORDER entered granting 29 Motion to Exclude as to Yale Strogoff (1) from 10/10/03 to 12/29/03 (Urso, Lisa) Modified on 1/5/2004 (Urso, Lisa). (Entered: 12/31/2003) |
| 01/07/2004 | | Judge Rya W. Zobel : Electronic ORDER entered granting [30] Motion |

| | | |
|---|---|---|
| | | to Continue as to Yale Strogoff (1). The motion to dismiss hearing is scheduled for 1/22/04 at 3:00 p.m. Entered (Urso, Lisa) (Entered: 01/07/2004) |
| 01/09/2004 | 31 | MOTION for release of passport as to Yale Strogoff . (Johnson, Jay) (Entered: 01/13/2004) |
| 01/09/2004 | 32 | RESPONSE to Motion by USA as to Yale Strogoff re 31 MOTION for release of passport (Johnson, Jay) (Entered: 01/13/2004) |
| 01/22/2004 | | Judge Rya W. Zobel : Electronic ORDER entered granting 31 Motion release of passport as to Yale Strogoff ("Allowed, provided that defendant shall first furnish to Pretrial Services a travel itenerary which he shall update if any changes are made, and that he redeposit in the court his passport w/in seven days after his return to the United States") (Johnson, Jay) (Entered: 01/23/2004) |
| 01/22/2004 | | Judge Rya W. Zobel : Electronic ORDER entered granting 26 Motion for Protective Order Regarding Disclosure of Income Tax Returns as to Yale Strogoff (1) (Johnson, Jay) (Entered: 01/23/2004) |
| 01/22/2004 | | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel :Motion Hearing as to Yale Strogoff held on 1/22/2004 re 24 MOTION to Dismiss filed by Yale Strogoff. Judge hears counsel and takes motion under advisement; Any affidavits or other pleadings filed by 2/13/04; Goverment by 2/18/04; (Urso, Lisa) (Entered: 01/26/2004) |
| 01/23/2004 | 33 | NOTICE OF ATTORNEY APPEARANCE: Kate M. Brown appearing for Yale Strogoff (Urso, Lisa) (Entered: 02/03/2004) |
| 02/05/2004 | 34 | Letter (non-motion) regarding Defendants Itinerary as to Yale Strogoff (Johnson, Jay) (Entered: 02/05/2004) |
| 02/23/2004 | | Judge Rya W. Zobel : Endorsed ORDER entered denying 24 Motion to Dismiss as to Yale Strogoff (1). The record does not support defendant's assertion that he had been granted immunity. (Urso, Lisa) (Entered: 02/23/2004) |
| 02/23/2004 | | Judge Rya W. Zobel : Endorsed ORDER entered denying 27 Motion for Discovery as to Yale Strogoff (1). Denied as to item 1 on the goverment's representation that is has searched for & found no such documents. Furthermore defendant has failed to show their relevance. Denied as to item 2 except to the extent the reports contain exculpatory evidence ehich shall be disclosed. (Urso, Lisa) (Entered: 02/23/2004) |
| 03/02/2004 | 35 | NOTICE OF HEARING as to Yale Strogoff Pretrial Conference set for 3/16/2004 03:00 PM in Courtroom 12 before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 03/02/2004) |
| 03/12/2004 | 36 | MOTION to Modify Conditions of Release and release of his passport as to Yale Strogoff . (Urso, Lisa) (Entered: 03/15/2004) |
| 03/16/2004 | | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel :Pretrial Conference as to Yale Strogoff held on 3/16/2004 Jury |

| | | Trial set for 5/17/2004 09:00 PM in Courtroom 12 before Judge Rya W. Zobel. 5-6 days; proposed questions to the jury 5/12/04; jury instructions 5/17/04; (Urso, Lisa) (Entered: 03/17/2004) |
|---|---|---|
| 04/01/2004 | 37 | MOTION to Modify Conditions of Release as to Yale Strogoff . (Johnson, Jay) (Entered: 04/05/2004) |
| 04/09/2004 | | Judge Rya W. Zobel : Electronic ORDER entered denying 37 Motion to Modify Conditions of Release as to Yale Strogoff (1)"Denied, in light of the scheduled trial, May 17,04" (Johnson, Jay) (Entered: 04/09/2004) |
| 05/12/2004 | 38 | PLEA AGREEMENT as to Yale Strogoff (Urso, Lisa) (Entered: 05/12/2004) |
| 05/17/2004 | | electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel : defendant sworn;Change of Plea Hearing as to Yale Strogoff held on 5/17/2004, Plea entered by Yale Strogoff (1) Guilty Count 1. Sentencing set for 8/10/2004 02:00 PM in Courtroom 12 before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 05/17/2004) |
| 05/17/2004 | 39 | Judge Rya W. Zobel : ORDER entered PROCEDURAL ORDER re sentencing hearing as to Yale Strogoff Sentencing set for 8/10/2004 02:00 PM in Courtroom 12 before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 05/17/2004) |
| 05/19/2004 | 40 | MOTION to Modify Conditions of Pre-Trial Release and Release of Passport as to Yale Strogoff . (Johnson, Jay) (Entered: 05/20/2004) |
| 05/24/2004 | 41 | RESPONSE to Motion by USA as to Yale Strogoff re 40 MOTION to Modify Conditions of Release (Urso, Lisa) (Entered: 05/25/2004) |
| 05/25/2004 | | Judge Rya W. Zobel : endorsed ORDER entered granting 40 Motion to Modify Conditions of Release as to Yale Strogoff (1). Defendant shall provide a copy of his itinerary to Pretrial Services. (Urso, Lisa) (Entered: 05/26/2004) |
| 06/10/2004 | 42 | NOTICE of Defendants Version of Offense by Yale Strogoff (Johnson, Jay) (Entered: 06/14/2004) |
| 08/06/2004 | 43 | MOTION for Downward Departure as to Yale Strogoff by USA. (Johnson, Jay) (Entered: 08/09/2004) |
| 08/09/2004 | | Motions terminated for statistical purposes as to Yale Strogoff : 16 MOTION for Discovery filed by Yale Strogoff. (Simeone, Maria) (Entered: 08/09/2004) |
| 08/09/2004 | 44 | MOTION to Continue sentencing as to Yale Strogoff . (Urso, Lisa) (Entered: 08/09/2004) |
| 08/09/2004 | | Judge Rya W. Zobel : endorsed ORDER entered denying 44 Motion to Continue as to Yale Strogoff (1). As the disposition in this case does not implicate Blakely. (Urso, Lisa) (Entered: 08/09/2004) |
| 08/10/2004 | | electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel :Sentencing held on 8/10/2004 for Yale Strogoff (1), Count(s) 1, |

| | | |
|---|---|---|
| | | The defendant is sentenced to 1 year Probation with 4 months of Home Confinement with electronic monitoring; $25,000 fine; $100.00 SA;. (Court Reporter Romanow.) (Urso, Lisa) (Entered: 08/11/2004) |
| 08/10/2004 | | Judge Rya W. Zobel : electronic ORDER entered granting 43 Motion for Departure as to Yale Strogoff (1) (Urso, Lisa) (Entered: 08/11/2004) |
| 08/12/2004 | 45 | Judge Rya W. Zobel : ORDER entered JUDGMENT as to Yale Strogoff (1), Count(s) 1, The defendant is sentenced to 1 year Probation with 4 months of Home Confinement with electronic monitoring; $25,000 fine; $100.00 SA;drug testing is suspended; (Urso, Lisa) Additional attachment(s) added on 7/26/2005 (Urso, Lisa). (Entered: 08/13/2004) |
| 08/12/2004 | 46 | Judge Rya W. Zobel : ORDER entered STATEMENT OF REASONS as to Yale Strogoff (Urso, Lisa) (Entered: 08/13/2004) |
| 09/20/2004 | 47 | STATUS REPORT *Satisfaction of Judgment* by USA as to Yale Strogoff (Donato, Christopher) (Entered: 09/20/2004) |
| 11/16/2004 | 48 | MOTION to Modify Conditions of Release as to Yale Strogoff/Early Termination of Electronic Monitoring . (Johnson, Jay) Modified on 11/17/2004 (Johnson, Jay). (Entered: 11/17/2004) |
| 12/08/2004 | 49 | Opposition by USA as to Yale Strogoff re 48 MOTION to Modify Conditions of Release (for early termination of electronic monitoring) (Johnson, Jay) (Entered: 12/09/2004) |
| 12/09/2004 | | Judge Rya W. Zobel : Endorsed ORDER entered granting 48 Motion to Modify Conditions of Release as to Yale Strogoff (1) effective 12/21/04. (Urso, Lisa) (Entered: 12/10/2004) |
| 10/03/2005 | 50 | TRANSCRIPT of Sentencing as to Yale Strogoff held on August 10, 2004 before Judge Zobel. Court Reporter: Richard H. Romanow. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/737-0370 or the Clerk's Office. (Scalfani, Deborah) (Entered: 10/03/2005) |
| 10/19/2005 | 51 | TRANSCRIPT of Change of Plea Hearing as to Yale Strogoff held on May 17, 2004 before Judge Zobel. Court Reporter: Valerie A. O'Hara. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/737-2346 or the Clerk's Office. (Scalfani, Deborah) (Entered: 10/19/2005) |
| 10/24/2005 | 52 | TRANSCRIPT of Motion to Dismiss Hearing as to Yale Strogoff held on January 22, 2004 before Judge Zobel. Court Reporter: Lee A. Marzilli. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/345-6787 or the Clerk's Office. (Scalfani, Deborah) (Entered: 10/24/2005) |