UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIM. NO. 05-10154-MLW |
| | ) |
| JOHN J. DIAMONT, JR. | ) |
| | ) |
| DEFENDANT | ) |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO EXCLUDE DISPUTED INVOICES AND DISPUTED CHECKS

Introduction

Defendant John J. Diamont, Jr. has moved, in limine, to exclude at trial two sets of documents produced from the files of S. Strogoff & Co. The defendant has mistakenly labeled one group of documents as "invoices." The other group of documents are certain checks, drawn on S. Strogoff & Co.'s account, which were cashed to generate the cash used to pay the defendant for certain scrap metal of his company. The defendant argues, incorrectly, that (1) the admissibility of these documents is controlled by Fed.R. Evid. 104(a), and not Fed.R. Evid. 104(b); (2) the documents are inadmissable hearsay, pursuant to Fed.R.Evid. 802; and (3) the documents do not qualify for admission under Fed.R.Evid. 803(6), as records of a regularly conducted activity.

The United States opposes this motion. We believe the admission of the disputed portions of these records is controlled by Fed.R Evid. 104(b), because their relevance to this case depends upon the jury finding that they are records relating to the cash payments to the defendant. Portions of these records are, in fact, hearsay, while other portions are not hearsay, either because they are not being offered to prove the truth of entries contained therein, or

1

because they are not assertive documents. The hearsay portions of the disputed records are admissible under Fed.R. Evid. 803(6), as records of a regularly conducted activity, and as co-conspirator statements, under Fed.R. Evid. 801(d)(2)(E).

Factual Background

The United States expects the evidence at trial will show the following:

Beginning in or about 1990, and continuing until 2003, Crystal Steel Company ("Crystal Steel") sold scrap metal to S. Strogoff & Co. The price for the scrap metal changed frequently and was negotiated between John Diamont, the President of Crystal Steel, and Yale Strogoff, the President of S. Strogoff & Co.

From time to time throughout the conspiratorial period, S. Strogoff & Co. would send an empty dumpster to Crystal Steel, which Crystal Steel employees would fill with scrap metal. When the dumpster was approaching being full, Crystal Steel would call S. Strogoff & Co., report the dumpster was almost full, and request that S. Strogoff & Co. come and pick up the dumpster and replace it with an empty dumpster. The frequency with which dumpsters were exchanged varied over the years, and during the course of a year, but on average approximated 2-3 times per week.

During the early part of the conspiratorial period, Crystal Steel arranged for the dumpsters, both empty and full, to be weighed at Rte 1 Storage, Inc., in Peabody, MA, a storage firm with a large scale. This firm issued two copies of a record showing the weight of the dumpster. The S. Strogoff & Co. driver gave one copy of this record to Crystal Steel and retained one copy. When the driver returned to S. Strogoff & Co. the dumpster was weighed again, both full and empty, and the Rte 1 Storage record, plus the two S. Strogoff & Co. scale

2

tickets, were turned in to the main office, usually to Jane Lemelin, the office manager. In the later years of the conspiratorial period Crystal Steel had its own scale and the empty and full dumpsters were weighed at Crystal Steel. Crystal Steel prepared two copies of a receipt, showing the weight, and the S. Strogoff & Co. truck driver signed the receipt to show that the weight recorded was what the scale showed, and then was given one copy of the receipt, which he turned in to the office upon his return to S. Strogoff & Co.

Each time a load of scrap metal was received from Crystal Steel, S. Strogoff & Co. prepared a "weigh slip" which recorded the date, the type of scrap metal, the gross weight of the dumpster (full), the tare weight of the dumpster (empty), the net weight of the metal received (gross weight minus tare), the price per net ton, and the total dollar amount of the transaction (net weight in tons times price). These slips were usually prepared by Jane Lemelin, but were occasionally prepared by others at S. Strogoff & Co. None of these weigh slips were sent to Crystal Steel.

Sometimes when weigh slips were prepared for loads received from Crystal Steel, Ms. Lemelin would record "Crystal Steel" on the name line of the weigh slip. See Exhibit 1, attached. On other occasions she would record on the name line the notation "S. Strogoff Money Market" or, less frequently, "Prudential Securities." See Exhibits 2 and 3 attached. Very infrequently the name line on the weigh slip was left blank. When "S. Strogoff Money Market" or "Prudential Securities" was recorded on the weigh slip, S. Strogoff & Co. would usually make a transfer of funds from its operating account into the named account, which was an interest bearing account.

Ms. Lemelin filed all the documents relating to each load received from Crystal Steel in a

3

file for Crystal Steel. These documents included the Rte 1 Storage records, the Crystal Steel scale receipts, the S. Strogoff & Co. scale tickets and the S. Strogoff & Co. weigh slips. This included the weigh slips with the entries on the name line "Crystal Steel", "S. Strogoff Money Market," and "Prudential Securities," as well as any weigh slips with blank name lines.

Approximately every 4 to 6 weeks John Diamont and Yale Strogoff would speak and agree to settle-up what S. Strogoff & Co. owed Crystal Steel for the scrap metal which had been received. During these conversations Diamont would tell Strogoff how much of the money owed he wanted by check made payable to Crystal Steel and how much he wanted in cash. Strogoff would, in turn, communicate this information to Jane Lemelin. In general, over the conspiratorial period, the split of the money between check and cash was usually, approximately, one third by check payable to Crystal Steel and two thirds in cash.

After speaking with Yale Strogoff, Jane Lemelin would prepare two "payout slips," to settle up with Crystal Steel, using the same form as had been used to record individual loads of metal. One payout slip would have the name Crystal Steel on it and the date it was prepared. It would list each load received since the last time the account was settled, and show the type of metal, the weight, a false price per net ton, and a dollar amount. See Exhibit 4, attached. The price recorded on this payout slip was substantially less than the agreed price between Diamont and Strogoff. The price recorded on the "Crystal Steel" weigh slip was selected to generate a check in the amount John Diamont had requested be payable by check to Crystal Steel.

The second payout slip recorded only the date it was prepared and the name of a fictitious payee, usually, but not always, a name with the initials "J.D.", to correspond with John Diamont. See Exhibit 5, attached. On this second payout slip Lemelin would record words to

4

the effect "payment for material to date" and a dollar amount equal to the amount to be paid in cash, which was calculated by taking the total amount owed, based on the true price agreed upon by Diamont and Strogoff, and deducting the amount paid by check payable to Crystal Steel.

In connection with settling up with Crystal Steel, Lemelin would prepare two checks drawn on S. Strogoff & Co.'s operating account at Broadway National Bank. See Exhibits 6 and 7, attached. One check was payable to Crystal Steel, in an amount which equaled the payout slip with the name Crystal Steel on it. This check, along with a copy of the corresponding payout slip, were mailed to Crystal Steel. The check was deposited into a Crystal Steel bank account and the revenue was declared on the books of Crystal Steel.

The second check was usually prepared in the name of the fictitious payee, and in an amount which equaled the second payout slip. This second check was cashed at Broadway National Bank, usually by Yale Strogoff. Mr. Strogoff would contact John Diamont and arrange a meeting. Both Strogoff and Diamont lived near each other in Marblehead at the time. The meetings usually occurred at Mr. Strogoff's home, although they occasionally occurred at Mr. Diamont's home. At these meetings Mr. Strogoff would hand Mr. Diamont an envelope of cash in an amount equal to the amount of the check to the fictitious payee. Mr. Diamont would pocket the cash, spend it for personal purposes, not declare it as revenue on Crystal Steel's books, and not declare it as income on his individual income tax return.

The United States has not made any final decisions as to which documents it will offer in evidence at trial, but it presently expects that it will offer at least (1) the S. Strogoff & Co. weigh slips for individual loads from Crystal Steel Co., which show the true, agreed-upon price; (2) the S. Strogoff & Co. payout slips with the name Crystal Steel; (3) the S. Strogoff & Co. payout slips

5

in the name of the fictitious payees; (4) the checks payable to Crystal Steel; and (5) the checks

payable to fictitious payees which were cashed. The United States understands that the defendant

is seeking to exclude at trial all of the S. Strogoff & Co. individual load weigh slips, without

regard to whether the name on the slip is "Crystal Steel," "S. Strogoff Money Market,"

"Prudential Securities," or blank, as well as all of the checks payable to fictitious payees. Deft's

Memorandum, p.4. The defendant did not address them in his Memorandum, but the United

States assumes that the defendant will also seek to exclude the payout slips with the name of the

ficticious payees on them.

Argument

I.     The Admission of the Disputed Weigh Slips, Payout Slips and Checks Is
       Controlled by Fed.R. Evid. 104(b), Because Their Relevance Is Dependent On
       The Jury Finding They Relate To Payments To John Diamont.

Fed. R. Evid. 104(b) provides:

> When the relevancy of evidence depends upon
> fulfillment of a condition of fact, the court shall
> admit it upon, or subject to, the introduction of
> evidence sufficient to support a finding of the
> fulfillment of the condition.

Here the relevance of the disputed weigh slips, payout slips, and checks is conditioned on the

jury finding that these records relate to S. Strogoff & Co's payments for scrap metal received

from Crystal Steel. Because these documents are relevant only if the jury finds they relate to

cash payments to John Diamont, their admission is controlled by Fed. R. Evid. 104(b).

As the Supreme Court explained in Huddleston v. United States, 485 U.S. 681, 690

(1998), in connection with the admissibility of evidence under Fed. R. Evid. 404(b):

> In determining whether the Government has

6

> introduced sufficient evidence to meet Rule
> 104(b), the trial court neither weighs credibility
> nor makes a finding that the Government has
> proved the conditional fact by a preponderance
> of the evidence.  The court simply examines all
> the evidence in the case and decides whether the
> jury could reasonably find the conditional fact ...
> by a preponderance of the evidence.

See also, Veranda Beach Club LLP v. Western Surety Co., 936 F.2d 1364, 1372 (1st Cir. 1991)

(Rule 104(b) governed whether plaintiff had shown sufficient foundation for jury to find that

"Robert F. Mongillo" named in a plea colloquy and criminal conviction was the same person as

the defendant on trial); Koster v. Trans World Airlines, 181 F.3d 24, 32-33 (1st Cir. 1999) (no

abuse of discretion in admitting under Rule 104(b) a portion of an employment manual, where

jury had to decide whether manual applied to plaintiff); United States v. Balthazard, 360 F.3d

309, 313 (1st Cir. 2004) (in marajuana growing case, Rule 104(b) controlled admission of

evidence of other marajuana growing operations, where conditional fact was whether these other

operations were in furtherance of the charged conspiracy.)

The preponderance of the evidence standard under Fed. R. Evid. 104(b) means that the

government must present sufficient evidence that a reasonable jury could find it was "more likely

than not" that the conditional fact is true.  United States v. Trenkler, 61 F.3d 45, 54 (1st Cir.

1995).  Thus, in the circumstances of this case, the United States must present sufficient evidence

at trial (the testimony of Jane Lemelin and Yale Strogoff) that a reasonable jury could find that

the disputed weigh slips, payout slips and checks relate to S. Strogoff & Co's payments for scrap

metal from Crystal Steel.

Fed. R. Evid. 104 assigns roles to the judge and the jury with regard to the admission of

7

evidence. Rule 104(a) provides that preliminary questions concerning the admissibility of

evidence "shall be determined by the court, subject to the provisions of subdivision (b)." Rule

104(b) provides that when the admissibility of evidence depends upon the finding of some other

fact, "the court shall admit [the evidence] upon ... the introduction of evidence sufficient to

support a finding of the [other fact]." In United States v. Barletta, 652 F.2d 218, 219 (1st Cir.

1981), the First Circuit explained the rationale for this rule:

> The court's role in ruling on the admissibility of evidence
> generally suggests that it should rule on the basis of its
> own factual assessment.  But [some] questions come []
> within a special subclass of preliminary questions, those
> which present precisely the same question as an ultimate
> issue of fact in the case, which we think demands a
> different standard: to preserve the proper allocation of
> responsibilities between judges and juries, such questions
> ought to be decided by the latter.  Thus the court's role in
> these instances is not to make a factual determination, but
> rather to rule as a matter of law whether a reasonable jury
> could properly find the ultimate fact in favor of the
> proponent of the evidence.

See also, MDU Resources Group v. W. R. Grace and Co., 14 F.3d 1274, 1281 (1st Cir.), cert.

denied, 513 U.S. 824 (1994)

The First Circuit has recently reaffirmed the Barletta rule regarding the proper role of

judges and juries in the admission of evidence and the interrelationship of subsections (a) and (b)

of Fed.R.Evid. 104. In Blake v. Pellegrino, 329 F.3d 43, 45 (1st Cir. 2003), a medical malpractice

action, Judge Young ordered that the cause of death be excised from a death certificate because

he doubted its truth. On plaintiff's appeal from a defendant's verdict, the First Circuit said:

> The fundamental question posed in this case implicates
> the division of responsibility between judge and jury. It
> asks whether a judge, presiding over a jury trial, may rule

8

> on the admissibility of evidence based upon his view of
> the persuasiveness of that evidence.

Id. at 47. The Court went on to state:

> The question reduces, therefore to whether, . . . a trial
> judge has authority to exclude evidence on the basis of his
> own belief as to the persuasiveness of that evidence. We
> conclude that, in a jury trial, no such authority exists.
> After all, the jury is the fact finder, and 'the ultimate
> arbiter of the persuasiveness of the proof must be the fact
> finder, not the lawgiver.' (citation omitted).

Id.

The First Circuit went on to explain that Fed.R.Evid. 104(a), on which the defendant

relies here, "enables a trial judge to decide whether foundational facts have been established," but

explained that "[t]hose facts include matters such as the genuineness of a document or statement,

the maker's personal knowledge, and the like." Id. at 48. The First Circuit concluded:

> Where, as here, a piece of evidence rests upon a proper
> foundation, Rule 104(a) does not permit a trial judge to
> usurp the jury's function and exclude the evidence based
> on the judge's determination that it lacks persuasive force.

Id. See also, United States v. Russell, 919 F.2d 795, 797 (1st Cir 1990) ("when a pretrial motion

raises a question of fact that is intertwined with the issues on the merits, the resolution of the

question of fact thus raised must be deferred until trial.")

We have not seen the defendant's purported evidence relating to the reliability of Yale

Strogoff's testimony, because of the defendant's attempts to hide behind ex parte affidavits from

his attorney. Like the district court in Blake v. Pellegrino, supra, we believe the defendant is

inviting this court to "usurp the jury's function," and we urge the court to reject the invitation.

9

II.    The Disputed Weigh Slips, Payout Slips, and Checks Are
       Not Excludable Under Fed.R.Evid. 802 As Hearsay.

The defendant argues that the disputed S. Strogoff & Co. weigh slips, payout slips and

checks are inadmissible hearsay because they are offered to prove the truth of the matters

asserted therein. Memorandum, pp. 16-17. This is not correct. These documents are offered,

primarily, as documentary corroboration for Yale Strogoff's testimony as to how he and John

Diamont carried out a conspiracy to impair and impede the Internal Revenue Service in the

administration of the tax laws. Certain of the entries in these documents, such as the names of

fictitious payees on the payout slips and checks, and the prices on the payout slips sent to Crystal

Steel, are being offered to prove their falsity, not their truth. There are a few entries in these

documents, such as the price recorded on the S. Strogoff & Co. weigh slips when a load was

received (the true price), and the Broadway National Bank stamps on the back of the checks,

which are offered to prove the truth of the matters asserted and are admissible under Fed.R.Evid.

803(6), as the records of a regularly conducted activity.

Fed.R.Evid. 801(c) defines hearsay as follows:

> "Hearsay" is a statement, other than one made by the
> declarant while testifying at the trial or hearing, offered
> in evidence to prove the truth of the matter asserted.

Thus, if documents are not offered in evidence to prove the truth of matters asserted therein, they

are not hearsay. United States v. Murphy, 193 F.3d 1, 5 (1st Cir. 1999) ("[s]o long as out-of-court

statements are not offered for their truth, they are not hearsay.") Here all of the disputed evidence

is offered to corroborate Yale Strogoff's testimony as to how this conspiracy operated. United

States v. Kaplan, 832 F.2d 676, 686 (1st Cir. 1987) (medical records introduced at trial "to

10

corroborate the testimony about falsification of [medical] bills", not excludable as hearsay.) The fact that these documents exist is relevant and probative evidence that the conspiracy operated in the manner described by Strogoff. Certainly if no such documents existed, the court would allow testimony of the absence of such records as a means of impeaching Strogoff's testimony.

Some of the entries in these documents are being offered in evidence to prove the falsity of the entries. Such entries include the prices on the S. Strogoff & Co. payout slips which were mailed to Crystal Steel and the names of fictitious payees on the payout slips and checks used to generate the cash paid to John Diamont. "When statements are introduced to prove the falsity of the matter asserted, they are not inadmissable as hearsay." United States v. Adkins, 741 F.2d 744, 746 (5th Cir. 1984) (emphasis in original); United States v. Hershenow, 680 F.2d 847, 861 n.12 (1st Cir. 1982) (records introduced to show statements were made, so those statements can be shown by other evidence to be false, are not excludable as hearsay).

There are some entries in these documents which will be offered to prove the truth of the matters asserted. These entries include the price recorded on the S. Strogoff & Co. weigh slips created when loads of scrap metal were received from Crystal Steel (the true price) and the Broadway National Bank stamps on the back of the fictitious payee checks, to prove the checks were cashed. These entries are records of a regularly conducted activity, and thus not excludable as hearsay, pursuant to Fed.R.Evid. 803(6)

Fed.R.Evid. 803(6) provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> ***

11

> (6) Records of Regularly Conducted Activity. - A
> memorandum, report, record, or data compilation, in any
> form, of acts, events, conditions, opinions, or diagnoses,
> made at or near the time by, or from information
> transmitted by, a person with knowledge, if kept in the
> course of a regularly conducted business activity, and if it
> was the regular practice of that business activity to make
> the memorandum, report, record or data compilation, all
> as shown by the testimony of the custodian or other
> qualified witness, or by certification that complies with
> Rule 902(11), Rule 902(12), or a statute permitting
> certification, unless the source of information or the
> method or circumstances of preparation indicate lack of
> trustworthiness.

Thus, to be admissible under Fed. R. Evid. 803(6):

> (1)    the record must have been prepared in the regular course of
>        business;
>
> (2)    it must have been made at or near the time of the events it
>        records; and
>
> (3)    it must be based on the personal knowledge of the entrant
>        or of an informant who had a business duty to transmit the
>        information to the entrant.

5 Weinstein's Federal Evidence, 2d Edition, §803.08, p. 803-56 (2004).  The determination of

whether a sufficient foundation has been laid for admission under Fed.R.Evid. 803(6) is within

the discretion of the trial court.  United States v. McGill, 953 F.2d 10, 13 (1st Cir. 1992); United

States v. Patterson, 644 F.2d 890, 901 (1st Cir. 1981).

    The United States expects to call Jane Lemelin to testify at trial as to the preparation of

the S. Strogoff & Co. weigh slips, payout slips and checks.  She is a former nun who was the

company's office manager for many years and personally prepared most of the disputed

documents.  In particular, she will be able to testify to the regularity of the practice at S. Strogoff

12

& Co. with regard to the creation of these records.  We expect that her testimony will fully

establish the elements of the Rule 803(6) exception to the hearsay rule.  If the defendant is

actually objecting to the Broadway National Bank stamps on the back of the S. Strogoff & Co.

checks, we will call a present or former employee of Broadway National Bank to testify as to the

bank's procedure for recording the fact that a check was cashed.  Again we expect this testimony

will fully satisfy the Rule 803(6) exception to the hearsay rule.

      The defendant relies on his attorney's <u>ex parte</u> affidavits to argue that the S. Strogoff &

Co. records are not reliable and lack trustworthiness.  Memorandum, pp. 18-20.  Such reliance on

<u>ex parte</u> submissions only highlights the unfairness of the non-adversarial process the defendant

has proposed here.  We, obviously, can not comment on, or rebut, what we have not seen.

      Rule 803(6) does provide that an otherwise admissible business record can be excluded if

"the source of information or the method or circumstances of preparation indicate lack of

trustworthiness."  The fact that a regular practice in the preparation of such records is

occasionally broken is not enough to avoid application of the business records rule.  <u>United

States v. Patterson</u>, 644 F.2d at 901 (envelopes stapled to bids to prove mailing); <u>United States v.

McGill</u>, 953 F.2d at 15 ("mere fact that errors or deviations have occurred from time to time does

not destroy the inference of underlying trustworthiness").  The fact that records are incomplete,

or that the proponent does not have underlying documentation goes to weight, but not the

admissibility, of business records.  <u>Wallace Motor Sales v. American Motor Sales Corp.</u>, 780

F.2d 1049, 1060-61 (1st Cir. 1985).  Similarly, the fact that a record is not created every time a

particular event occurs does not demand exclusion under Rule 803(6).  <u>Kassel v. Gannett Co.,

Inc.</u>, 875 F.2d 935, 944-45 (1st Cir. 1989) (two "Report of Contact" forms filled out by VA

13

officials admitted as business records, even though forms were completed only when official

"perceived the need" to document calls.)  Thus, the First Circuit has upheld as admissible as

business records under Rule 803(6) the notations of a drug dealer on a calendar regarding how

much cocaine he sold that day, United States v. Lizotte, 856 F. 2d 341 344 (1st Cir. 1988), and

the hand written notations of a truck driver regarding his oil deliveries, even though there were

some admitted errors.  United States v. Cincotta, 689 F. 2d 238, 243 (1st Cir. 1982).

     The defendant appears to argue that because the disputed documents were created as part

of a conspiracy with John Diamont to impair the IRS, and they contain entries that the United

States acknowledges are false, they do not qualify for admission pursuant to Fed.R.Evid. 803(6).

Memorandum, p. 19.  In United States v. Cooper, 868 F.2d 1505, 1514 (6th Cir. 1989), a

prosecution for conspiracy to possess with intent to distribute controlled substances by false

prescriptions, the Court upheld the admission of a log book of false prescriptions, over a Rule

803(6) objection, stating "it mattes not that the business of the Clinic was the creation and sale of

forged prescriptions."  See also, United States v. Bonallo, 858 F.2d 1427, 1435-36 (9th Cir.

1988), upholding the admission of altered computer records under Rule 803(6), over an objection

for untrustworthiness because they were altered.

     III.     The Disputed Evidence Is Not Hearsay Pursuant to
               Fed. R. Evid. 801(d)(2)(E) As CoConspirator Statements

Fed.. R. Evid. 801(d)(2)(E) provides:

     (d) Statements which are not hearsay.  A statements is not hearsay if -
                    * * *
          (2) Admissions by a party-opponent.  The statement is offered against
          a party and is . . . (E) a statement by a coconspirator of a party during the
          course and in furtherance of the conspiracy.

14

In order to admit a coconspirator statement the government must show, by a preponderance of the evidence, that the defendant and the declarant are members of a conspiracy and that the statements was made during, and in furtherance of, the conspiracy. Bourjaily v. United States, 483 U.S. 171 (1987).

To the extent there are assertions of fact in the disputed S. Strogoff & Co. weigh slips, payout slips, and checks, which are being offered to prove the truth of the matters asserted, those assertions are not hearsay because they are statements of a coconspirator during the course, and in furtherance of, the conspiracy alleged in the indictment. Fed. R. Evid. 801(d)(2)(E). The declarant is Yale Strogoff. The statements are being offered against a party, John Diamont. There is no question these statements were made during the course of the conspiratorial period. The documents further the conspiracy because they assist Yale Strogoff in keeping track of what monies Diamont wanted in cash and getting that cash to him.

In United States v. Kaplan, 832 F.2d 676 (1st Cir. 1987), the First Circuit upheld the admission of certain medical files, as coconspirator statements , in circumstances remarkably similar to this case. Kaplan was a prosecution of an attorney for mail fraud in connection with a scheme to defraud insurance companies based on false bills from doctors in auto accident cases. Id. at 678-79. Among other evidence, the government offered in evidence files of Drs. Rosenthal and Hershenow, which included "dictated notes" (containing accurate treatment dates) and "patient file cover sheets" containing information used to generate false bills). Id. at 686. The defendant objected to the admission of these medical records on hearsay grounds and the First Circuit found there was no clear error in the trial court's ruling that the files "were admissible as co-conspirator statements under Rule 801(d)(2)(E)." Id. In finding that the

15

medical records met the "in furtherance" requirement of Rule 801(d)(2)(E) the Court relied on the fact that the medical records helped the doctors prepare false bills which appeared truthful. Id. It made no difference that Kaplan had never seen the doctors' internal medical files. Id.

Similarly here Strogoff's weigh slips, payout slips and checks help him keep track of what metal he has received from Diamont, what price he has agreed to pay for that metal, and how much he has paid by check. They also help him generate the cash he needs to pay Diamont the agreed portion of the price in cash. From Diamont's prospective, the records Strogoff sends him insures that if the IRS ever audited Diamont's business, he will have records to show the IRS that indicate he was declaring his scrap metal money as revenue to the business.

IV.    There Is No Need To Conduct A Pretrial Evidentiary Hearing
        Regarding The Admissibility of the Disputed Evidence

The defendant seeks a pretrial evidentiary hearing on the admissibility of the disputed evidence. Motion, pp. 1 and 2; Memorandum, pp. 14-15. The defendant relies principally on the ex parte affidavits of his attorney to support this request. Id.

Fed.R.Evid. 104(c) authorizes the court to hold hearings on preliminary matters relating to the admission of evidence "when the interests of justice require." The Court has broad discretion in deciding whether to hold such a hearing. 1 Weinstein's Federal Evidence, 2nd Edition, §104-40[2], p. 104-72 (2005).

The United States sees no need for a pretrial evidentiary hearing in this case regarding the admissibility of the disputed S. Strogoff & Co. weigh slips, payout slips and checks. It seems relatively clear that the admission of this evidence will be controlled by Fed.R.Evid 104(b) and that the United States will have sufficient evidence for the jury to find, by a preponderance of the

16

evidence, that these documents relate to the payments to John Diamont for Crystal Steel's scrap metal. Similarly, we do not expect any substantial issues under Fed.R.Evid803(6) and 801(d)(2)(E) with regard to the admissibility of this evidence.

The defendant's reliance on secret, ex parte, affidavits from his attorney to justify a pretrial evidentiary hearing only highlights the fundamental unfairness of the process he proposes. The defendant will gain tremendous tactical advantages if the court orders a pretrial evidentiary hearing. He will get to hear, and cross examine if he chooses, key government witnesses, out of the presence of the jury and well in advance of the trial. Thus even if the court declines to grant the defendant's motion to exclude this evidence, the defendant will have won advantages by the mere fact that a hearing was held.

The United States is at a substantial, unfair disadvantage on the issue of objecting to a pretrial evidentiary hearing. We do not object to deciding these issues in limine. This will enable both sides to better prepare for trial. But based on the information available to us, there is no reason to believe that "the interests of justice require" a pretrial evidentiary hearing. Because the benefits of such a hearing are so one-sided, in favor of the defense, we think fundamental fairness dictates that the ex parte affidavits be disclosed to us, and we get an opportunity to respond to them, before the Court orders any pretrial evidentiary hearing.

## Conclusion

For the foregoing reasons, the Court should decline to hold any pretrial evidentiary hearings on the defendant's motion, unless and until the First and Second Kendall affidavits are disclosed to the United States and it gets an opportunity to respond to them. The Court should rule, in limine, that it will not exclude the disputed S. Strogoff & Co. weigh slips, payout slips

17

and checks on the grounds set forth in the defendant's motion and memorandum.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Peter A. Mullin
PETER A. MULLIN
Assistant U.S. Attorney

Dated: May 12, 2006

## Request for Oral Argument

Pursuant to L.R. 7.1(D), the United States requests oral argument on this motion.

## Certificate of Service

I, Peter A. Mullin, Assistant U.S. Attorney, hereby certify that a true copy of this document was served on counsel of record for the defendant by electronic filing this 12th day of May, 2006.

/s/ Peter A. Mullin
PETER A. MULLIN
Assistant U.S. Attorney

18

617 884-3909

27480

# S. STROGOFF & COMPANY INC.

IRON AND METAL SCRAP & BROKERAGE

P.O. BOX 505293

315 THIRD STREET                    CHELSEA, MASS. 02150-5293

| SOLD BY | | | | DATE |
|---|---|---|---|---|
| | ☐ CASH | ☐ CHECK | | 4/5/96 |
| DRIVER ☐ OFF ☐ ON | WEIGHER | | REG. No. | CUSTOMER No. |

NAME *Crystal Steel*

ADDRESS

| MATERIAL | PRICE | AMOUNT |
|---|---|---|
| *Skul* | | |
| 64360 | | |
| 33510 | | |
| 30850 | 70 N.T. | 1079.75 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | TOTAL | |

Exhibit 1

617 884-3909

27829

# S. STROGOFF & COMPANY INC.

**IRON AND METAL SCRAP & BROKERAGE**

P.O. BOX 505293

315 THIRD STREET                              CHELSEA, MASS. 02150-5293

| SOLD BY | | | | DATE |
|---|---|---|---|---|
| | ☐ CASH | ☐ CHECK | | 4/25/96 |
| DRIVER ☐ OFF ☐ ON | WEIGHER | REG. No. | | CUSTOMER No. |

NAME  *S. Strogoff Money Market*

ADDRESS

| MATERIAL | PRICE | AMOUNT |
|---|---|---|
| Skul | | |
| 43240 | | |
| 33590 | | |
| 29560 | 70 N.T. | 1034 60 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Exhibit 2

617 884-3909

42979

# S. STROGOFF & COMPANY INC.

**IRON AND METAL SCRAP & BROKERAGE**

P.O. BOX 505293

315 THIRD STREET                    CHELSEA, MASS. 02150-5293

| SOLD BY | | ☐ CASH   ☐ CHECK | DATE 3/17/98 |
|---|---|---|---|
| DRIVER  ☐ OFF  ☐ ON | WEIGHER | REG. No. | CUSTOMER No. |

NAME *Prudential Securities*

ADDRESS

| MATERIAL | | PRICE | AMOUNT |
|---|---|---|---|
| *Shul.* | 35920 | | |
| | 5500 | | |
| | 30420 | 70 N.T. | 1064 70 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTAL** | | | |

Exhibit 3

617 884-3909

27902

# S. STROGOFF & COMPANY INC.

**IRON AND METAL SCRAP & BROKERAGE**

P.O. BOX 505293

**315 THIRD STREET**              **CHELSEA, MASS. 02150-5293**

| SOLD BY | | ☐ CASH    ☐ CHECK | DATE 5/9/96 |
|---|---|---|---|
| DRIVER ☐ OFF  ☐ ON | WEIGHER | REG. No. | CUSTOMER No. |

NAME *Crystal Steel*

ADDRESS

| MATERIAL | | PRICE | AMOUNT |
|---|---|---|---|
| *Skid* | 23550 | 25 NT | 294 38 |
| " | 30850 | 25 NT | 385 62 |
| '' | 28910 | 25 NT | 361 37 |
| " | 19820 | 25 NT | 247 75 |
| " | 36890 | 25 NT | 461 12 |
| '' | 21020 | 25 NT | 262 75 |
| '' | 29090 | 25 NT | 363 62 |
| '' | 25720 | 25 NT | 321 50 |
| '' | 29560 | 25 NT | 369 50 |
| " | 33710 | 25 NT | 421 37 |
| **TOTAL** | | | |

Exhibit 4

**617 884-3909**

28087

# S. STROGOFF & COMPANY INC.

**IRON AND METAL SCRAP & BROKERAGE**

P.O. BOX 505293

315 THIRD STREET                                    CHELSEA, MASS. 02150-5293

| SOLD BY | | | | DATE 5/9/96 |
|---|---|---|---|---|
| | ☐ CASH | ☐ CHECK | | |
| DRIVER ☐ OFF ☐ ON | WEIGHER | REG. No. | | CUSTOMER No. |

NAME *Crystal Steel*

ADDRESS

| MATERIAL | | PRICE | AMOUNT | |
|---|---|---|---|---|
| *Steel.* | 29890 # | 25 N.T. | 373 | 62 |
| " | 22090 # | 25 N.T. | 276 | 12 |
| " | 29760 # | 25 N.T. | 372 | 00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | **TOTAL** | | 4510 | 72 |

617 884-3909

28113

# S. STROGOFF & COMPANY INC.

**IRON AND METAL SCRAP & BROKERAGE**

P.O. BOX 505293

315 THIRD STREET                    CHELSEA, MASS. 02150-5293

| SOLD BY | | | | | | DATE 5/9/96 |
|---|---|---|---|---|---|---|
| | | ☐ CASH | | ☐ CHECK | | |
| DRIVER ☐ OFF ☐ ON | WEIGHER | | REG. No. | | | CUSTOMER No. |

NAME  *J. Davidson*

ADDRESS

| MATERIAL | PRICE | AMOUNT |
|---|---|---|
| *Payment for Steel up to Date* | | 8119 38 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **TOTAL** | | |

Exhibit 5

# S. Strogoff & Company, Inc.

**IRON & METAL SCRAP AND BROKERAGE**

315 THIRD STREET, P.O. BOX 293
CHELSEA, MASS. 02150-5293

THE BROADWAY NATIONAL BANK
OF CHELSEA
CHELSEA, MA.

**18599**

53-222
---
113

PAY  *THE SUM 45 TO DOLS 72 CTS*  DOLLARS

| DATE | CHECK NUMBER | AMOUNT |
|------|--------------|--------|
| 5/9/96 | | 4510 72 |

TO THE
ORDER OF  *Crystal Stu* **PROCESSED**

MAY 13 96

S. STROGOFF & COMPANY, INC.

⑆011302221⑆  ⑈61 840 3⑈   ⑆0000451072⑈

CRYSTAL STEEL CORP

Exhibit 6

## S. Strogoff & Company, Inc.
**IRON & METAL SCRAP AND BROKERAGE**
315 THIRD STREET, P.O. BOX 293
CHELSEA, MASS. 02150-5293

THE BROADWAY NATIONAL BANK
OF CHELSEA
CHELSEA, MA.

**18605**

53-222
113

PAY THE SUM 8 T T 9 DOLS 38 CTS                    DOLLARS

TO THE ORDER OF    J. Davidson          PROCESSED

MAY -9 96

| DATE | CHECK NUMBER | AMOUNT |
|------|--------------|--------|
| 5/9/96 |  | 8119.38 |

S. STROGOFF & COMPANY, INC.

⑈011302221⑈  ⑆61 840 3⑈        ⑈0000811938⑈⑈

MY '96' 09
011801052

003NB 1103 50996M044    *8119.38CC

Exhibit 7